# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 9, 2004 Session

## HOLLI THACKER HANEY, ET AL. v. BRADLEY COUNTY BOARD OF EDUCATION, ET AL.

### Appeal from the Circuit Court for Bradley County
### No. V-01-1033    Lawrence H. Puckett, Judge

---

### No. E2003-02531-COA-R3-CV Filed September 20, 2004

---

Holli Thacker Haney ("Plaintiff") had two children who attended Michigan Avenue Elementary School (the "School") in Bradley County. Plaintiff's husband, Tracy Thacker ("Thacker"), was not the biological father of the oldest child, but he was the biological father of the youngest child. Thacker filed for divorce, and he and Plaintiff were in sharp disagreement over custody matters. Apparently believing he was going to lose on the custody issues, on the morning of December 12, 2000, Thacker went to the School and signed out both children. The School required Thacker to provide a written explanation as to why the children were being signed out. Thacker wrote "Keeping Promise by Mother" and "Pay Back" as his reasons for signing out the children. School employees did not read what Thacker had written prior to allowing him to leave the premises with the children. Tragically, Thacker then murdered both young children. Plaintiff sued the Bradley County Board of Education asserting claims of negligence and negligence *per se* based on the School's allowing Thacker to sign out the children and leave the School with them on December 12. The Trial Court granted the Board of Education's motion for summary judgment. We affirm in part, reverse in part, and remand for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit
### Court Affirmed in Part and Reversed in Part; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Lynn Perry, Cleveland, Tennessee, for the Appellant Holli Thacker Haney, individually and as Administratrix of the Estate of Maylyn Thacker and the Estate of Carson Thacker.

Charles W. Cagle, Robert G. Wheeler, Jr., and Deb A. Smith, Nashville, Tennessee, for the Appellee Bradley County Board of Education.

# OPINION

## Background

This lawsuit was filed by Plaintiff against the Bradley County Board of Education (the "Board" or "Board of Education") following the tragic murder of Plaintiff's two young children. Before we discuss the specifics of Plaintiff's lawsuit, some background information is necessary. Plaintiff and Thacker were married on February 29, 1992. This was Plaintiff's first marriage. Thacker had been married previously. Plaintiff was pregnant when she married Thacker. Both Plaintiff and Thacker were aware that Thacker might not be the biological father of the unborn child, but they nevertheless proceeded with the marriage. Plaintiff gave birth to a daughter, Maylyn, in August of 1992. Even though the paternity of Maylyn was uncertain, Thacker was listed on the birth certificate as her father, she was given Thacker's last name, and Thacker raised Maylyn as though she were his child. Plaintiff and Thacker had a son, Carson, who was born in December of 1994.

Thacker filed for divorce in May of 2000, alleging irreconcilable differences had arisen between him and Plaintiff. In his complaint for divorce, Thacker stated that genetic testing had proven that he was not Maylyn's biological father. Along with the complaint, Thacker filed a Marital Dissolution Agreement ("MDA") which had been signed by Thacker and Plaintiff. The MDA provided for joint custody of Carson, designated Thacker as the primary residential parent, and set forth Plaintiff's visitation schedule. The MDA made no mention of Maylyn. The following month, at Thacker's request a guardian ad litem was appointed on Maylyn's behalf.

Even though the divorce action was pending, Plaintiff and both children continued living with Thacker, as well as Thacker's daughter and step-daughter from his previous marriage. In September of 2000, Plaintiff and Thacker separated. That same month, Plaintiff filed a motion to set aside the MDA and for a temporary restraining order. In support of the motion, Plaintiff filed her affidavit stating that Thacker had threatened to kill her and her mother and sister if she contested the divorce. Plaintiff claimed it was because of these threats that she signed the MDA which designated Thacker as Carson's primary residential parent. Based on the contents of the affidavit, Plaintiff's motion for a temporary restraining order was granted. The restraining order further provided that "the parties will treat the Marital Dissolution Agreement as a Temporary Order until further orders of the Court." This resulted in Thacker being Carson's primary residential parent and Plaintiff being Maylyn's primary residential parent while the divorce litigation was pending.[1] Notwithstanding the fact that Thacker was not Maylyn's biological father, he continued to exercise overnight visitation with Maylyn and refer to her as his daughter.

Throughout the divorce proceedings, Thacker was insistent that he be Carson's primary residential parent. Thacker apparently came to realize that this was not likely to happen and on the morning of December 12, 2000, he went to the School where Maylyn attended third grade and

---

[1] Some of this information was obtained from a sworn statement Plaintiff provided to the Tennessee Bureau of Investigation on December 13, 2000, the day after the children died.

Carson attended kindergarten. Thacker signed out both children from school. On the sign-out sheet, Thacker wrote "Keeping Promise by Mother" as the reason for signing out Maylyn, and "Pay Back" as the reason for signing out Carson. The School's office employees did not read the reasons Thacker gave for signing out the children before allowing Thacker to leave with the children, and Thacker was allowed to leave with the children with no questions asked. Thacker returned to his house and stabbed the children to death. After murdering the children, he set their bodies and the house on fire.

Plaintiff's lawsuit against the Board of Education is based on theories of negligence and negligence *per se*. The complaint centers around the School's allowing Thacker to sign out the children. In the complaint, Plaintiff alleged the School was negligent in not obtaining a proper reason for the dismissal of the children before allowing them to leave, and in allowing them to leave with Thacker when Plaintiff had specifically requested that Thacker not be allowed to remove the children from the School's premises. Plaintiff also claimed the School failed to comply with its own policy by not allowing Plaintiff to deny Thacker access to the children. Plaintiff further claimed that School representatives were aware of Thacker's violent propensities and, therefore, were negligent in allowing him to take the children from the School. According to Plaintiff, had the School not improperly allowed Thacker to leave with the children, they would not have died.

The Board filed a motion for summary judgment claiming the undisputed material facts showed: (1) the School complied with the Board of Education's early-dismissal policy; (2) even if the School violated the early dismissal policy, the policy itself cannot form the basis of a negligence *per se* claim; (3) the School's representatives acted with reasonable and ordinary care; (4) Thacker's murder of the children was the proximate cause of Plaintiff's injuries; and (5) the Board was immune pursuant to the Tennessee Governmental Tort Liability Act. Numerous depositions were filed with the Trial Court both in support of the Board's motion for summary judgment, and in support of Plaintiff's opposition thereto.

In August of 2003, the Trial Court issued a very detailed and thoughtful Memorandum Opinion granting the Board's motion for summary judgment. In summary, the Trial Court concluded: 1) Thacker was the legal father of Maylyn; 2) the School complied with the Board of Education's policy on early dismissal; 3) Thacker's murder of the children was not foreseeable; 4) the Board was immune pursuant to the Tennessee Governmental Tort Liability Act because the School's representatives complied with the Board's policy and procedure regarding early dismissal and acted in furtherance of the legislative directive underlying the Board's early dismissal policy; and 5) the School had no legal duty to withhold the children from one parent at the request of the other parent under the circumstances of this case. On appeal, Plaintiff challenges each of these rulings by the Trial Court.

**Discussion**

In *Blair v. West Town Mall*, our Supreme Court recently reiterated the standards applicable when appellate courts are reviewing a motion for summary judgment. *Blair v. West Town Mall*, 130 S.W.3d 761 (Tenn. 2004). In *Blair*, the Court stated:

> The standards governing an appellate court's review of a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tennessee Rule of Civil Procedure 56 have been met. *See Staples v. CBL & Assoc., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991). Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: 1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and 2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *Staples*, 15 S.W.3d at 88.

> * * *

> When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact.

> To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. If the moving party fails to negate a claimed basis for the suit, the non-moving party's burden to produce evidence establishing the existence of a genuine issue for trial is not triggered and the motion for summary judgment must fail. If the moving party successfully negates a claimed basis for the action, the non-moving party may not simply rest upon the pleadings, but must offer proof to establish the existence of the essential elements of the claim.

*Blair*, 130 S.W.3d at 763-64, 767 (quoting *Staples*, 15 S.W.3d at 88-89).

-4-

Our Supreme Court also has provided instruction regarding assessing the evidence when dealing with a motion for summary judgment, stating:

> The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer*, 952 S.W.2d at 426; *Byrd v. Hall*, 847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

*Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000).

The Board's early dismissal policy (the "Policy") in effect at the relevant time provides, in pertinent part, as follows:

### DISMISSAL PRECAUTIONS

The following procedure will be observed with regard to dismissal of students during school hours:

1. No student will leave school prior to regular dismissal hours, except with the request of the parent and approval of the principal. Record of the time and date of departure and return of all students leaving or returning to the school during the school day with the reason for leaving shall be kept on file for the entire year.…

In addition to the foregoing, the School has what is referred to as a "custody book" wherein the School keeps court documents dealing with custody awards, visitation restrictions, and the like.

We first will address Plaintiff's negligence *per se* claim. The Board argues that even if the Policy was violated, violation of a school board policy cannot form the basis of a negligence *per se* claim. In *Smith v. Owen*, 841 S.W.2d 828 (Tenn. Ct. App. 1992), this Court observed that:

> The doctrine of negligence *per se* is firmly established in our case law. In order to recover on the basis of negligence *per se*, three elements must be established. First, it must be shown that the defendant violated a statute or ordinance which "imposes a duty or prohibits an act for the benefit of a person or the public." *Nevill v.*

-5-

*City of Tullahoma,* 756 S.W.2d 226, 232-233 (Tenn. 1988) ….
Second, the proof must show that the injured party was within the
class of persons whom the legislative body intended to benefit and
protect by the enactment of that particular statute or ordinance.… In
addition to establishing negligence *per se* by showing these two
elements, the plaintiff must of course show that such negligence was
the proximate cause of the injury.…

*Smith v. Owen*, 841 S.W.2d at 831 (citations omitted in part).

In *Snider v. Snider*, 855 S.W.2d 588 (Tenn. Ct. App. 1993), this Court addressed
whether the violation of a school board policy could form the basis of a negligence *per se* claim.
*Snider* involved a minor child who had signed herself out of school and eventually was found at the
home of a distant relative. Thereafter, the school was instructed by the parents not to let anyone
except the parents check their daughter out of school. Later that same school year, the child became
sick at school. The school was unable to locate the parents and the child's uncle, who worked with
the father, was contacted and agreed to pick up the child. After picking up the child from school,
the uncle raped the child causing serious physical and emotional injuries. *Id.* at 589. The school
board's policy stated that students should not be allowed to leave school "without request of the
parent/guardian and the approval of the principal." *Id.* at 590.

In addressing the various issues, the *Snider* Court noted that schools, teachers, and
administrators have a duty to exercise ordinary care for the safety of students. *Id.* at 590 (citing
*Roberts v. Robertson County Bd. of Educ.*, 692 S.W.2d 863, 870 (Tenn. Ct. App. 1985)). With
regard to the plaintiffs' negligence *per se* claim, the *Snider* Court stated that "[n]ot every violation
of a statute or ordinance is negligence per se; it depends on the type of statute or ordinance and the
reason it was adopted.… A violation of one's own rules presents even more serious problems."
*Snider*, 855 S.W.2d at 590. The *Snider* Court went on to discuss cases involving claimed violations
of private rules or rules which did not rise to the level of statutes or ordinances. In so doing, the
*Snider* Court quoted the following excerpt *from Epstein, Henning & Co. v. Nashville Chatt. & St.
L. Ry. Co.*, 4 Tenn. App. 412, 420-21 (1926):

Private rules of a master regulating the conduct of his servants
in the management of his own business, although designed for the
protection of others, stand on an entirely different footing from
statutes and municipal ordinances designed for the protection of the
public. The latter, as far as they go, fix the standard of duty toward
those whom they were intended to protect, and a violation of them is
negligence in law or per se. But a person cannot, by the adoption of
private rules, fix the standard of his duty to others. That is fixed by
law, either statutory or common. Such rules may require more, or
they may require less, than the law requires; and whether a certain
course of conduct is negligent, or the exercise of reasonable care,

must be determined by the standard fixed by law, without regard to any private rules of the party.

*Snider*, 588 S.W.2d at 590-91.

After discussing *Epstein* and similar cases, the *Snider* Court concluded the trial court had properly dismissed the plaintiffs' negligence *per se* claim. Specifically, the *Snider* Court stated:

> Under these authorities we are of the opinion that a violation of the school board policy did not amount to negligence per se. Even if a violation [of the school board policy] could be introduced as some evidence of negligence on the part of the defendants, under all of the circumstances in this case we are of the opinion that the evidence does not preponderate against the finding of the trial judge that the defendants were not negligent. Here, an eleven-year-old child complained of being ill and attempted to call her parents in order to be taken home. Subsequently, the child's uncle showed up to sign her out and the child showed no hesitancy in leaving with him. Under these circumstances the school officials had no notice that the person signing the child out posed a threat. Thus, we do not think the release of the child amounted to negligence.…
>
> Assuming that the conduct of the defendants did amount to negligence, we think the plaintiffs' case fails for the other reason cited by the trial judge: the defendants' negligence was not the proximate cause of the injury because the injury was entirely unforeseeable.…

*Snider*, 855 S.W.2d at 591.

In the present case, we agree with the Board that its Policy cannot form the basis of a negligence *per se* claim. The Policy is neither a statute nor an ordinance. Rather, it is a rule adopted by the Board of Education intended to regulate the conduct of school employees when releasing students during school hours. The applicable standard of care owed by the Board and the School is established by law, not the Policy. Accordingly, we affirm the judgment of the Trial Court when it granted the Board's motion for summary judgment on Plaintiff's negligence *per se* claim.

Plaintiff next argues that the School was negligent when it released Maylyn to Thacker because: (1) Thacker was not Maylyn's biological father; (2) School employees were aware Thacker was not Maylyn's biological father; and (3) only a day or two before Maylyn's murder, Plaintiff had instructed the School not to release Maylyn to Thacker. When Plaintiff instructed the School not to release Maylyn to Thacker, Plaintiff was informed by the School that it must have legal documentation in order to prohibit Thacker from signing her out. Plaintiff responded by stating that,

according to her attorney, because Thacker was not Maylyn's biological father she did not need any documentation in order to prevent that from happening.

In its Memorandum Opinion, the Trial Court correctly noted that Thacker was presumed to be Maylyn's father pursuant to Tenn. Code Ann. § 36-2-304(a)(1) because she was born while Thacker and Plaintiff were married. This is, however, a rebuttable presumption which was effectively rebutted when the DNA test conclusively established that Thacker was not Maylyn's biological father. Although this Court cannot ascertain the exact date the DNA test was performed, it obviously was conducted prior to May of 2000 when the complaint for divorce which discussed the DNA test results was filed.

As stated previously, after the complaint for divorce was filed and once Plaintiff and Thacker separated, Thacker continued to exercise overnight visitation with Maylyn and continued to refer to her as his daughter. Maylyn never was told Thacker was not her biological father. Maylyn's guardian ad litem met with Plaintiff in May of 2000 and a report discussing this meeting states:

> Mrs. Thacker states that Tracy "is a good father" to both Carson and Maylyn. She recognizes the close emotional ties between Maylyn and her husband. Mrs. Thacker insisted, "I don't want him to be taken out of Maylyn's life."

The guardian's report also details discussions with Thacker. The report indicates that Thacker wanted to have the same rights as a natural father would have when it came to Maylyn. Thacker stated: "Maylyn is my daughter … I've raised her for 8 ½ years and I'm the only Dad she knows."

The recommendation of the guardian ad litem contains the following conclusion:

> [T]he Guardian is vehement in his recommendation to the Court that Tracy Thacker, whom Maylyn has since birth and still now considers to be her father, continue to have a large role in her life assuming custody is awarded to [the] mother ….

In October of 2000, Maylyn's third grade class was to take a field trip to a pumpkin patch for Halloween. Plaintiff signed an authorization for Maylyn to go on this field trip and wrote the following on the authorization: "Maylyn's dad, Tracy Thacker, would like to chaperone. Please mark him down. He will drive his own car. Thanks!" In a sworn statement provided to the Tennessee Bureau of Investigation the day following the children's deaths, Plaintiff stated: "Tracy and I had joint custody of the children but he had primary residence of our son."

Based on the foregoing, the Trial Court ruled that for all intents and purposes, Thacker was Maylyn's father. After reaching this conclusion, the Trial Court stated:

What the court is ruling here is that where two parents are involved, the school has no legal duty to follow the instructions of one parent to withhold the children from the custody of the other parent unless the instruction is accompanied by a court order which limits the other parent's custodial rights in the way the parent's instruction proposes.

Given the peculiar facts of this case as outlined above, we agree with the Trial Court that, as a matter of law, the School was not negligent in requiring Plaintiff to provide legal documentation to the effect that Thacker no longer had any rights to Maylyn or, at a minimum, no right to sign her out from school before it could prohibit Thacker from doing just that. For most of the time Maylyn attended the School, the School had no reason to believe Thacker was not her biological father. For instance, the School had Maylyn's birth certificate which listed Thacker as her father, etc. It was not until sometime in 2000 before the paternity of Maylyn ever was questioned. Regardless of whether Thacker was Maylyn's biological father or whether the School was aware of that fact, Plaintiff and Thacker conducted themselves as though Thacker was Maylyn's father both before and after they separated. Plaintiff voiced no objection to Thacker's signing out Maylyn until just a day or two before December 12, and then only after she and Thacker had a heated argument. Maylyn was a child born during Plaintiff's and Thacker's marriage, and there was no court order down restricting Thacker's access to Maylyn. For these reasons, we believe the School quite properly informed Plaintiff that she would need a court order stating Thacker could no longer sign out Maylyn before such a restriction could be enforced. The language in the divorce complaint states only that Thacker was not Maylyn's biological father and falls far short of meeting this requirement. Our conclusion is only that the School, as a matter of law, was not negligent in continuing to treat Thacker as Maylyn's father based on the facts and the conduct of Plaintiff and Thacker detailed above. We affirm the judgment of the Trial Court on this issue.

Plaintiff then claims there is a genuine issue of material fact on whether the School was negligent in releasing the children to Thacker because certain School employees had knowledge of Thacker's violent propensities. Plaintiff testified in her deposition to mental and emotional abuse inflicted by Thacker during their marriage. This abuse turned physical in 1998 and Plaintiff pursued criminal assault charges against Thacker on one occasion in May of 2000. Much of Plaintiff's brief is devoted to showing that various School employees were aware of the pending divorce, the custody battle, and Thackers's propensity to act violently, especially when it came to Plaintiff. However, the only evidence presented regarding Thacker potentially harming *the children* was Plaintiff's testimony that it had "crossed her mind" Thacker might harm Maylyn because she was not his child. Even though this had crossed her mind, Plaintiff admitted Thacker never threatened to harm the children and she never witnessed any such conduct prior to that horrible day. Plaintiff acknowledged Carson spent the night with Thacker the evening prior to December 12, and she never would have allowed that to happen if she thought any harm would come to the child. In short, absent any proof that Thacker had harmed or intended to harm the children, we do not believe Plaintiff's testimony as to events occurring prior to that fateful day and who at the School knew what is sufficient, in and of itself, to create a factual issue on whether the School was negligent in releasing the children to Thacker.

However, we next must consider whether there is a genuine issue of material fact as to Plaintiff's negligence claim when taking into account what Thacker wrote on the sign out sheet. Resolution of this issue requires a more detailed discussion of the events which occurred the day before and the day of the murders.

On December 11, 2000, Plaintiff asked her mother to pick-up the children from school for her, which she did. About an hour later, Thacker called Plaintiff wanting to know where the children were. When Plaintiff told Thacker she had the children, he stated he was coming over to get them. Plaintiff then informed Thacker that she would not allow him to take the children. Once this discussion ended, Thacker proceeded to call Plaintiff's mother several times "cussing her for taking the kids" from school. Plaintiff eventually talked to her attorney and was informed that she could not stop Thacker from taking Carson because of the terms of the temporary custody order. Later that evening, Plaintiff and Thacker continued to argue and Thacker drove to Plaintiff's residence with the intent of picking-up both children. Plaintiff refused to allow Maylyn to go with Thacker. When Thacker asked Plaintiff why she would not allow his daughter to go with him, Plaintiff told Thacker it was because he was unfit and because he was not her actual father. Plaintiff did allow Carson to go with Thacker. When Plaintiff told Thacker when she would retrieve Carson, he told her "no," that her visitation "had just been dropped to two weekends a month." Thacker then left with Carson.

Thacker was upset that the School had allowed Plaintiff's mother to pick-up the children. On December 11, between the above arguments with Plaintiff, Thacker hand delivered to the School some of the pleadings from the divorce litigation.[2] We can only assume Thacker's intent was to show the School that Plaintiff's mother did not have any rights insofar as the children were concerned and not to allow her to take the children in the future. Thacker gave the documents to Henrietta Morrow ("Morrow"), who then called Plaintiff. During this discussion Plaintiff told Morrow that the School was no longer allowed to release the children to Thacker. According to Plaintiff, Morrow told her that without legal papers specifically prohibiting Thacker from signing out the children, there was nothing the School could do to prevent that from happening. Plaintiff then told Morrow that because Thacker was not the biological father of Maylyn, she (i.e. Plaintiff) did not need any legal papers to prevent the School from releasing Maylyn to Thacker.

The next day Thacker took Carson to school and Plaintiff took Maylyn to school. When Thacker returned home, he had a telephone conversation with either his attorney or Maylyn's guardian ad litem. During an apparently heated conversation, Thacker placed the phone next to his step-daughter Crystal's ear. According to Crystal, "I heard the attorney tell him that if he called up again then he was going to drop the case with Maylyn, and he'd also told him that he'd already lost the kids anyway." After this conversation Thacker went into a rage and started breaking items in the house. Once Thacker calmed down some, he told Crystal that he was going to get the kids from school and left the house.

---

[2] The School later destroyed these documents so we do not know exactly which documents were provided to the School, although Principal Lowery did recall seeing the MDA.

Thacker returned to the School at approximately 9:30 a.m. and went directly to Maylyn's classroom. Thacker spoke with Maylyn who then informed her teacher that she was being checked out of school. The teacher refused to let Maylyn leave and told Thacker he would have to sign her out at the office. Thacker then went to the office. The School had a "Sign-In/Out Sheet" which a parent or guardian was required to fill out before a student would be dismissed early. The person signing this sheet was required to give certain information, including an explanation for the reason the child was being taken out of school. On the Sign-In/Out Sheet, Thacker wrote "Keeping Promise by Mother" as the reason for signing out Maylyn.[3] The reason Thacker gave for signing out Carson was "Pay Back." Not one of the School's office employees read at that time the reasons Thacker gave for signing out the children. It then was announced over the School's intercom system that Maylyn and Carson were being checked out. Maylyn waited in her classroom until she heard the announcement and then left to meet Thacker at the office.

Carson's kindergarten teacher was Teresa Stephenson ("Stephenson"). Stephenson testified that her kindergarten class ordinarily has birthday parties for each student and Carson's birthday was December 14. Stephenson called Plaintiff the morning of December 12 to discuss Carson's upcoming birthday party. Approximately one hour later, it was announced over the intercom system that Carson was being checked out of school. Because School policy required kindergarten students to be accompanied by an adult at all times, Stephenson left her teaching assistant in charge of the class and accompanied Carson to the office. Stephenson testified that she had just talked with Plaintiff "about an hour before and she mentioned nothing about him leaving, and I was just curious as to why he was leaving." Stephenson walked Carson to the office and Thacker was waiting in the hallway. According to Stephenson:

> Tracy was down at the entrance. There's a little hall entrance where the front door is and he was standing at the corner and Maylyn walked up about the same time, and Tracy waved for Carson to come on. In fact, I think he said, come on, Carson, and Carson took off running to his dad. He was happy to see him.
>
> So I kept going and I was going to speak with Tracy as I always do with all parents. I try to speak to my parents and that's when he looked at me and he just put his hand up like, stop. He didn't say anything. Carson went to him and when Carson got to his father, Tracy waved at me and said, hi, and went on out.

Stephenson then started back toward her classroom. She was at the door of the classroom when her curiosity got the best of her and she turned around and went back to the office to see the reason Thacker had given for signing out Carson. When Stephenson read what Thacker had written she became "concerned. It was not a normal remark." Janice Nicholson and Erin Hattabaugh were in the office and neither one of them had read what Thacker had written down.

---

[3] Plaintiff claims Thacker apparently meant to write "Keeping Promise *to* Mother."

Stephenson showed the remarks to Ms. Nicholson who stated Thacker was probably paying Plaintiff back for Plaintiff's mother having picked up the children the day before. Apparently unconvinced by Ms. Nicholson's possible explanation for the comments, Stephenson decided to show Thacker's comments to Dorene Lowery ("Lowery"), the School Principal. Lowery was paged over the intercom system and arrived at the office a couple of minutes later. After reading what Thacker had written, Lowery asked Stephenson to go to her (i.e. Lowery's) office and retrieve the legal papers Thacker had brought to the School the day before. While Stephenson was looking for these documents, Lowery went outside to see if Thacker was still on the premises. Unfortunately, Thacker already was gone. Lowery returned to the office and at about the same time, the school resource officer, David O'Boyle ("O'Boyle"), walked into the office. Lowery was showing O'Boyle the reasons Thacker had given for checking out the children when a call came over O'Boyle's police radio giving a code number and Thacker's address. O'Boyle stated the code number indicated arson. Lowery then instructed O'Boyle to go to Thacker's residence. Lowery then received a phone call from Thacker's attorney advising her that Tacker had threatened to kill himself and the children. Lowery informed the attorney that Thacker already had left with the children. Lowery immediately went to the Thacker residence with the intention of bringing the children back to the School. There were several police cars already present and smoke was coming from the house when Lowery arrived at the Thacker residence. Unbeknownst to Lowery, Thacker already had stabbed Maylyn and Carson to death, poured gasoline over their bodies, and set them and the house on fire. Lowery heard gun shots a few moments after she arrived.

A few minutes prior to Lowery's arrival, Thacker was sitting outside of the burning house holding a bloody knife when the first police officer arrived. Thacker told the officer that he had killed the children. The officer pleaded with Thacker to allow him to retrieve the bodies of the children from the burning house, but Thacker refused to stand down. After more police officers arrived, Thacker charged the first officer while brandishing the bloody knife and was shot to death. These were the gunshots Lowery heard when she arrived at the scene.

We now will consider whether there is a genuine issue of material fact relevant to Plaintiff's claim that the School was negligent in allowing the children to leave with Thacker in light of the reasons he gave for signing out the children. In order for Plaintiff to prevail on her negligence claim, she must establish the following elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 99 (Tenn. Ct. App. 2001)(quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). The issue of whether the School owed a duty to Plaintiff is a question of law to be decided by the court. *Lett*, 60 S.W.3d at 99.

We have already noted that schools, teachers, and administrators have a duty to exercise ordinary care for the safety of their students. *See Snider*, 855 S.W.2d at 590; *Roberts*, 692 S.W.2d at 870. What is considered "ordinary care" is not a fixed standard and evolves over time along with the law under which it is defined. Like many other aspects of society, our nation's school systems have been forced to react to the changing times. Locker searches and policies prohibiting

-12-

drugs and weapons were relatively unheard of if not nonexistent in the not-so-distant past. Now, school's are in court defending the legality of so-called zero tolerance policies. The words Columbine High School have taken on a separate meaning unto themselves, along with Oklahoma City and September 11th.

In the present case, the Board claims the School's employees acted reasonably and followed the requirements of the early dismissal policy, i.e., the children were dismissed from school early at the request of a parent after the time, date, and reason for early dismissal were provided. The Board asserts that, as a general rule, a school has no legal right to prohibit a parent from signing-out their child and, therefore, there is no corresponding duty to examine the reason provided by the parent prior to that parent leaving with his or her child. The Board maintains that it only requires an explanation for early dismissal so the School can determine whether the absence is excused or unexcused in accordance with truancy laws. The Trial Court agreed with the Board and concluded the purpose of the Policy was not so the School "may refuse to let the parent take the child," but to enable the School to determine whether the absence was excused or unexcused in accordance with Tenn. Code Ann. § 49-6-3007(e)(1).[4]

Earlier in this Opinion we agreed with the Board that the Policy does not set the standard of conduct required of the School when we affirmed the dismissal of Plaintiff's negligence *per se* claim. The Board now takes the inconsistent position by arguing that the School's compliance with that Policy conclusively negates any negligence claim. Even assuming the Trial Court was correct when it concluded the sole purpose behind the Policy was so the School could determine whether or not the absence was excused, we do not believe the purpose behind the Policy is necessarily determinative of whether the School was negligent.

The deposition of Robert Taylor ("Taylor"), the Director of Schools for Bradley County, was filed with the Trial Court. Taylor testified that in his experience of ten years as a principal and almost two years as the Director of Schools, there was only one occasion when a parent was not allowed to sign out his child and that was because the parent was visibly intoxicated when he arrived at the school. This testimony certainly shows that the Board accepted as part of its duty to its students that the safety of a student can take precedence over a parent's right to have their child released from school, which is precisely the way it, unfortunately, must be.

Testimony by the School's principal, Lowery, also raises a genuine issue as to whether the sole purpose behind the Policy was so the School could determine whether or not the absence was excused. Specifically, Lowery testified that if an adult came in to check a child out

---

[4] Tenn. Code Ann. §v 49-6-3007(e)(1) provides: "It is the duty of the principal or teacher of every public, private or parochial school to report promptly to the director of schools, or the director of schools' designated representative, the names of all children who have withdrawn from school, or who have been absent five (5) days (this means an aggregate of five (5) days during the school year and not necessarily five (5) consecutive days) without adequate excuse. Each successive accumulation of five (5) unexcused absences by a student shall also be reported."

from the School and the School personnel did not know that adult, the School's personnel would "find out what's going on or who that person is, absolutely." Therefore, Lowery admits that at least in some circumstances the School's personnel would review the explanation given by an adult before allowing an adult to check out a child, clearly something that is not necessary to do in order to enable the School to determine later whether or not the absence was excused.

While School employees required Thacker to provide an explanation for the early dismissal, the obvious problem is that no one ever *read* that explanation prior to allowing Thacker to leave with the children. It is difficult to image the rationale behind a policy which requires someone to provide an explanation before they are allowed to engage in an affirmative act, but then does not require that explanation be read before the person is allowed to engage in that act. Because the Policy requires a written explanation before any parent can sign out their child, we believe it is implicit in that Policy that the reason actually be read *before* the parent and child leave. We conclude that the Policy was not complied with when Thacker provided the required written explanation for signing out the children, but was allowed to leave without anyone from the school having read that explanation. Even if the School's failure to read Thacker's explanation was not a violation of the Policy, we nevertheless hold that the School's duty to exercise reasonable care for the safety of its students requires the School to read even a parent's explanation for signing out his or her children before they are allowed to leave.

The Board claims that even if the School was required to read Thacker's explanation for signing out the children, Plaintiff's claim nevertheless must be dismissed because Thacker's brutal murder of the children was not foreseeable in much the same way as the rape of the minor student in *Snider, supra,* was held to be unforeseeable. Had Thacker's stated reasons for signing-out the children been innocuous, we would agree. But Thacker's stated reasons were not innocuous and were clearly troubling to the School once the School personnel read them. According to Stephenson, when she read what Thacker wrote she was "concerned" because the comments were not "normal." When Principal Lowery read the comments, she was concerned enough to go outside to see if Thacker had left the premises, and then to show the comments to the school resource officer. In our opinion, the comments written by Thacker are ominous at the very least and set this case apart from the facts in *Snider*. We believe the reasons Thacker gave for signing out the children were of such a nature that reasonable minds could differ on whether Thacker intended to cause bodily harm to the children. Given the facts as now presented to us at this summary judgment stage, we believe there is a genuine issue of material fact regarding whether the actual harm inflicted on these children would have been foreseeable had someone at the School read Thacker's reasons for checking out the children before the children were released to him.

Having concluded that the School had a duty to read the reasons Thacker gave for signing out the children and that there is a genuine issue of material fact on whether the murders were foreseeable, the final issue is whether the Board is nevertheless immune pursuant to the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. § 29-20-101 *et seq.* There is no dispute that the Board is a governmental entity and the GTLA applies.

-14-

The GTLA was enacted in 1973 and codified the common law rule that "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities …." § 29-20-201(a). Later in the statute, immunity for injuries caused by negligent acts or omission of governmental employees is removed, and then several exceptions to the removal of immunity are listed. § 29-20-205. At issue in this case is whether the Board is immune because the discretionary function exception to removal of immunity applies. The relevant statutory section provides:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:
>
> (1) the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused; …

Tenn. Code Ann. § 29-20-205(1). The Trial Court concluded that the discretionary function exception applied and the Board was, therefore, immune from Plaintiff's negligence claim.

In *Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73 (Tenn. 2001), our Supreme Court discussed the discretionary function exception to removal of immunity as follows:

> This exception immunizes local governmental entities from liability for an employee's negligence if the injury arises out of "the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." Essentially, the discretionary function exception prevents the use of tort actions to second-guess what are essentially legislative or administrative decisions involving social, political, economic, scientific, or professional policies or some mixture of these policies. *Doe v. Coffee County Bd. of Educ.*, 852 S.W.2d 899, 907 (Tenn. Ct. App. 1992) (citing *United States v. Gaubert*, 499 U.S. 315, 323, 111 S. Ct. 1267, 113 L.Ed.2d 335 (1991)). The rationale for preserving immunity for certain acts performed by governmental entities is that the government should be permitted to operate without undue interference by the courts, as courts are often "ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision." *Bowers v. City of Chattanooga*, 826 S.W.2d 427, 431 (Tenn. 1992) (quoting *Wainscott v. State*, 642 P.2d 1355, 1356 (Alaska 1982)); *see also Carlson v. State*, 598 P.2d 969, 972 (Alaska 1979).

In *Bowers v. City of Chattanooga*, this Court recognized that a more precise method of analysis was needed for determining which acts are entitled to discretionary function immunity. Consequently, we adopted the planning-operational test under which it is the "nature of the conduct," that is, the decision-making process, and not the "status of the actor," *Bowers*, 826 S.W.2d at 430-31, that governs whether the exception applies. *See also United States v. Gaubert*, 499 U.S. 315, 322, 111 S. Ct. 1267, 113 L.Ed.2d 335 (1991). Under this analysis, a planning decision is most likely to reflect a course of conduct that was determined after consideration or debate by those in charge of formulating plans or policies. *Bowers*, 826 S.W.2d at 430 (citing *Carlson*, 598 P.2d at 972-73). Decisions that rise to the level of planning or policy-making are considered to be discretionary acts requiring judicial restraint and are, therefore, not subject to tort liability. On the other hand, decisions that merely implement pre-existing policies and regulations are considered to be operational in nature and require the decision-maker to act reasonably in implementing the established policy. If the policy, regulation, or other standard of procedure mandates specific conduct, then any employee reasonably complying with that direction will not abrogate the entity's immunity if the action furthers the underlying policies of the regulation. *See generally Chase v. City of Memphis*, 971 S.W.2d 380, 384 (Tenn. 1998). If such an employee does not act reasonably but pursues a course of conduct that violates mandatory regulation, the discretionary function exception will not apply because the action would be contrary to the entity's established policy. *Id.*; *see also Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267.

*Limbaugh*, 59 S.W.3d at 84-85.

The inaction of School employees in not reading the reasons Thacker gave for signing out the children cannot be characterized as a planning decision reflecting a course of conduct by those in charge of formulating the Policy. Rather, it was a failure in the implementation of the Policy adopted by the Board of Education, which is "operational in nature and require[s] the decision-maker to act reasonably in implementing the established policy." *Limbaugh*, 59 S.W.3d at 85. We conclude that the discretionary/planning function exception to the removal of immunity does not apply to shield the actions of the School employees which took place on December 12, 2000. Therefore, the Board is not immune from suit on this negligence claim.

-16-

## **Conclusion**

The Judgment of the Trial Court is affirmed in part and reversed in part, and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion. Exercising our discretion, costs on appeal are assessed equally against the Appellant, Holli Thacker Haney, and her surety, and the Appellee, Bradley County Board of Education.

_____
D. MICHAEL SWINEY, JUDGE