# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 11, 2007 Session

## KALA DEAN and LEXIE M. DEAN v. WEAKLEY COUNTY BOARD OF EDUCATION

**Appeal from the Circuit Court for Weakley County**
**No. 3935      William B. Acree, Judge**

---

**No. W2007-00159-COA-R3-CV - Filed April 9, 2008**

---

This is a negligence case. The plaintiff, a female high school student, was being verbally harassed by a male student. The plaintiff complained repeatedly to a school administrator, who assured her that he would take care of the situation. The male student's taunts did not stop and he threatened to beat up the plaintiff. The school administrator was told about the threat and took no action. Subsequently, in the school hallway, a confrontation between the male student and the female plaintiff resulted in the male student punching the plaintiff in the face and causing serious injuries. A lawsuit was filed on behalf of the female student against the high school board of education. The trial court denied the school board's motion for summary judgment, and the case was tried. The trial court found for the plaintiff, awarding damages and medical expenses. The school board argued that the award should be reduced under comparative fault principles, but the trial court declined to do so because it found that the male student was the instigator. The school board appeals, arguing, *inter alia*, that the trial court erred by denying its motion for summary judgment, by not holding that the school board was immune under the public duty doctrine, by allocating no fault to the plaintiff, by not appropriately weighing judicial admissions of fault by the plaintiff, and by applying the clear and convincing evidence standard to determine whether the school board had established comparative fault. We affirm, finding that the denial of the summary judgment motion is not appealable after a trial on the merits, that the public duty doctrine is not applicable, that the trial court found that the male student was the instigator under the preponderance of the evidence standard, and that the preponderance of the evidence supports the trial court's decision, even considering the plaintiff's judicial admissions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S. and DAVID R. FARMER, J., joined.

Charles M. Purcell and Andrew V. Sellers, Jackson, Tennessee, for the Defendant/Appellant Weakley County Board of Education

Mark L. Agee and Jason C. Scott, Trenton, Tennessee, for the Plaintiffs/Appellees Kala Dean and Lexie Dean

## OPINION

### FACTS AND TRIAL COURT PROCEEDINGS

This case arises out of a simmering dispute between two high school students that culminated in a violent confrontation. At the time of the incident, Plaintiff/Appellee Kala Dean ("Kala") was a fourteen-year-old freshman at Westview High School ("Westview High"), and Thomas Dial ("Dial) was fifteen years old, repeating his freshman year at Westview High. Westview High is a school with more than 650 students, located in Martin, Weakley County, Tennessee.

Before he came to Westview High, Dial earned a disciplinary record at his middle school, Sharon School. His eighth grade disciplinary infractions included numerous instances of disrespect toward teachers and other students, name-calling toward female students, kicking one girl in the knee, and shoving another girl's head. These infractions resulted in Dial being sent to an alternative school, Carroll Academy, in December 2000. Sharon School, Carroll Academy, and Westview High are all under the purview of Defendant/Appellant Weakley County Board of Education ("Board").

Dial enrolled in Westview High for the first time in the ninth grade in August 2001. His disciplinary record from Sharon School and from Carroll Academy was not sent to Westview High; Westview High received only his prior grades, health record, and test scores. During the 2001-2002 school year at Westview High, Dial began compiling a new disciplinary record that included numerous incidents of insubordination, "scuffling," "derogatory comments to different females," and putting a note down the front of a female student's blouse. He was suspended for spitting at another female student. Dial's mother was called to the school more than once. At the conclusion of that year, it was determined that Dial needed to repeat the ninth grade.

Consequently, at the outset of the 2002-2003 school year, Dial and Kala were both enrolled in the ninth grade. Although Dial knew Kala's older brother Matthew Dean ("Matthew"), also a Westview High student, Kala and Dial had not met before that school year. They were in the same science class and had their lunch break at the same time.

Approximately one week into the school year, the problems began. Name-calling and unpleasant noises quickly escalated into Dial repeatedly calling Kala a "bitch," a "slut," a "whore," and a "fat ass."

Kala told her parents about Dial's conduct, and they told her to talk to one of Westview High's school administrators. Kala met with Rusty Taylor ("Coach Taylor"), the assistant vice-principal at Westview High and the administrator who was primarily responsible for student disciplinary matters. Kala told Coach Taylor that Dial had been calling her names and specified the names he had been using. Coach Taylor told her that he would "take care" of the problem, and

advised her to try to avoid contact with Dial. Coach Taylor then had Dial come to his office to discuss Kala's complaints. Dial told Coach Taylor that Kala had been calling him names as well, so Coach Taylor also advised Dial to simply avoid contact with Kala.

Despite Coach Taylor's meeting with Dial, his verbal abuse toward Kala continued. Kala met with Coach Taylor on several subsequent occasions, once with her older brother Matthew, and once with a friend, Nicole Lewis ("Lewis"). In response, Coach Taylor met with Dial a second time, but his conduct toward Kala continued unabated.

When Dial did not respond to Coach Taylor's admonitions, Kala and Matthew confronted Dial at school in an effort to get him to leave Kala alone. Dial responded by telling Kala and Matthew that he would "whoop [their] ass" if they did not "get down the hall." Kala told Coach Taylor what Dial had said, to which Coach Taylor again responded that he would "take care" of the problem. On another occasion, Kala approached Dial at lunch, and he responded by telling her to get away from his table or he would "kick her butt . . . or something like that." Kala told Coach Taylor about this incident as well.

On October 2, 2002, Dial approached Kala's table in the school lunchroom and a verbal confrontation ensued. Shortly after the lunch break, Kala was in the crowded school hallway. Dial was also in the hallway with his then-girlfriend and fellow student, Amanda McDaniel. Another confrontation occurred. Dial hit Kala in the face with his fist, knocking her unconscious, breaking her jaw in two places, and collapsing her sinus cavity.[1]

Kala's father came to the school and took her to the local emergency room. From there she was transferred to Methodist Hospital in Jackson, Tennessee. She was treated by Sam Rickman, M.D. ("Dr. Rickman"), an oral and maxillofacial surgeon. Kala had considerable swelling and bruising over her left cheek bone, and X-rays revealed that her "lower jaw was broken in two places, and the left outer wall of her maxillary sinus was broken also." Consequently, the next day, Dr. Rickman performed surgery on Kala's jaw. Dr. Rickman would later testify during a deposition:

> The fractures of the lower jaw on the left side were exposed through incisions inside the mouth. The broken bones were realigned. The impacted wisdom tooth on the lower left side . . . prevented the segments from being lined up ideally. It was removed. And the left angle fracture, once the segments had been lined up, were secured, held in place with titanium plates and titanium screws. The left coronoid fracture was manually reduced or its position—its correct position insured, and it was immobilized by having her teeth immobilized.

Kala's jaw was immobilized with "elastics" and "[a]rch bars, which are kind of like braces." As a result, Kala was unable to open her mouth, except to eat. For six weeks, Kala "was allowed to

---

[1] After the incident, Dial was suspended from school for ten days, and Kala received a three-day suspension, apparently based on the assertion that she instigated the fight.

remove her elastics to [eat] a pureed diet and then to put them back on. So she essentially wore them 24 hours a day except to eat, and then she was instructed as soon as she finished eating she was to brush her teeth and reapply the elastics."

Subsequently, a lawsuit was filed on Kala's behalf by her father, naming as defendants Dial, Dial's mother, Coach Taylor, and the Board. The complaint asserted a claim for assault against Dial and his mother, and a claim for negligent supervision against Coach Taylor and the Board. Coach Taylor was dismissed from the lawsuit by a consent order, and the case was settled as to Dial and Dial's mother. Kala's claims against the Board remained pending. Discovery ensued.

Thereafter, the Board filed a motion for summary judgment. It asserted that the Board had not breached its duty, that Kala's injury was not foreseeable, and that Kala was at least fifty percent at fault for her injuries because she started the fight with Dial. The Board further argued that Kala's father should be dismissed from the lawsuit because Kala had become an emancipated minor since her father filed the lawsuit on her behalf.[2] In its motion, the Board also asserted immunity under Tennessee Code Annotated § 29-20-205(1) of the Governmental Tort Liability Act ("GTLA").[3]

The trial court denied the Board's motion for summary judgment, finding that there were material factual disputes. Regarding the Board's argument that Kala's father should have been dismissed from the lawsuit, the trial court ordered the plaintiffs to amend the complaint to name both Kala and her father as individual plaintiffs.[4] The case then proceeded to trial.

At the outset, the trial court heard testimony from Andrew Laney ("Laney"), a Westview High student who was in the school hallway when the altercation between Kala and Dial took place.[5] Laney testified that he was standing with his back toward the hall when he heard people arguing behind him. Laney turned around to see Dial hit Kala in the face. He saw Kala fall to the ground and Dial standing over her "kind of pumped up . . . ." Laney immediately went over to Dial, grabbed him, and pushed him down the hall. Laney said he did not see Kala try to hit Dial.

Another Westview High student, Nicole Lewis ("Lewis"), then testified about her recollection of the October 2 events. During the lunch break, Lewis testified, she was sitting at the lunch table with Kala. She remembered Dial approaching Kala at the lunch table and yelling at her, calling her names such as "bitch." In the lunchroom, Lewis said, there was no physical contact

_____

[2]Kala married before turning eighteen, but after her father filed the lawsuit.

[3]The Board did not include an argument based on the public duty doctrine in the summary judgment motion.

[4]The record shows that the plaintiffs did not amend the complaint until after the trial. The order allowing the amendment, however, indicates that the Board did not oppose the amendment.

[5]Counsel for the Board objected to Laney's testimony on the grounds that Laney was not identified by the Plaintiffs in response to an interrogatory asking for the identity of persons with knowledge of the events. Because Laney's identity was disclosed in a deposition, the Board's objection was overruled and he was permitted to testify.

-4-

between Kala and Dial. Immediately after lunch, Lewis was with Kala in the crowded hallway when the incident occurred:

> Q (Plaintiffs' counsel): Were you close enough if there had been something going on that your attention would come to it pretty quick, do you think?
> A: Yes.
> Q: And what was the first thing that brought it to your attention that something was happening?
> A: When she hit the floor.
> Q: Okay. Did you ever hear any fighting going on prior to you turning and she's hitting the floor?
> A: No.
> Q: Whether indirectly or out of the corner of your eye, did you see any kind of her swinging around stuff or anything of that nature?
> A: Huh-uh, no.
> Q: All right. After she hit the floor, what happened?
> A: She blacked out and myself and a couple of other girls went over to make sure she was okay.

Thus, Lewis did not see Kala do anything in the hallway to initiate a confrontation with Dial. Lewis said that she was friends with Kala at the time of the incident, but had since lost touch with her.

Kala's older brother Matthew testified. At the time of the incident, he was also a Westview High student. When Kala's problems with Dial arose, he said, he accompanied Kala to see Coach Taylor about it. Matthew said that Coach Taylor told them he would take care of it, but went on to suggest that Matthew "do what a brother would do" and "lock up" with Dial outside of school. Matthew took Coach Taylor's statements to mean that he should fight with Dial away from school.

Kala testified as well. She said that she first met Dial in science class at the beginning of her freshman year at Westview High, and that the problems began about a week into the school year. She was aware that Dial had had conflicts with her brother Matthew the previous school year. For no apparent reason, Dial began calling her names, such as "bitch," "slut," "whore," and "fat ass." After this happened several times, Kala told her parents and, upon their advice, went to see Coach Taylor. As Dial's verbal abuse continued, she said, she reported his conduct to Coach Taylor. Kala reported to Coach Taylor on several occasions, once with Matthew, once with Nicole Lewis, and several times by herself. She said that Coach Taylor assured her that he would take care of the problem and advised her to stay away from Dial. She testified that Coach Taylor suggested that Matthew meet Dial outside of school and "take care of the problem." On one occasion, she said, she and Matthew tried to talk to Dial, without threatening or cursing, to persuade him to leave Kala alone. Dial's response was to tell them "get down the hall before he whipped [their] ass." On another occasion, she said, she approached Dial at his lunch table to ask him to stop his behavior, and he "told [her] to get away from his table before he hit [her]." Despite Coach Taylor's repeated assurances, Dial's verbal abuse continued.

On the day of the incident, October 2, 2002, Kala said that Dial approached her table during the lunch period, saying that somebody had told him that she was looking for him. She could not recall what Dial said to her, but remembered that it was "embarrassing" and that Dial's girlfriend came over and "pulled him away." Kala testified that she had no physical contact with Dial at that time. After that, Kala recalled seeing Dial leave the lunchroom, and remembered talking to friends in the hallway. The next thing she remembered was waking up on the floor with "a lot of people around [her]." She did not recall hitting Dial or knocking his book bag off his shoulder. She simply had no recollection of what had happened immediately before Dial hit her.

Kala described her injuries, her surgery, her pain, and having to have her jaw wired and immobilized for six weeks. After the incident, she said, she became fearful and afraid to go out, and asked her parents to permit her to sleep with them. She did not return to Westview High, but completed her high school education by home schooling and obtaining her G.E.D.

The trial court heard testimony from Dial's mother, Nada Guill ("Guill"). Guill testified that, during Dial's first year in the ninth grade at Westview High, he was paddled and suspended after a variety of offenses against female classmates, including name-calling, spitting at a girl, and stuffing a note down another's blouse. She had a conference with Coach Taylor, assured him that she would talk to Dial, and asked Coach Taylor to let her know if further problems occurred. Prior to attending Westview High, Dial attended middle school at Sharon School. After a series of offenses against female classmates such as name-calling, kicking one female student and shoving another's head, Dial was sent to Carroll Academy. Both schools were part of the Weakley County school system. Guill did not learn of Dial's conflict with Kala until she received a call from the Martin police department that they were holding her son in custody.

Dial testified about his version of the events. The trouble between he and Kala began, he asserted, when both of them began "cussing" each other. Coach Taylor called Dial to his office, he said, because Kala had told Coach Taylor "that I was cussing her and didn't say anything about her cussing me." Dial admitted telling Kala and her brother to "get down the hall" or he would "whip [their] ass," but said it was in response to the Dean siblings "cussing [him] and telling [him] they were going to whoop [his] ass."

On October 2, 2002, Dial testified, he approached the table in the lunchroom where Kala was sitting. He maintained that he did not approach her to start any trouble with her, but rather because he was told that Kala was looking for him. He therefore "asked her what was going on and what she wanted [him] for." Kala, he said, accused him of talking about her. When he denied this, Dial said, Kala punched him in the chest.[6] When she did this, he said, he "turned around and walked off."

Dial then testified about the confrontation with Kala in the hallway after lunch:

---

[6] The transcript of Dial's trial testimony on the lunchroom conversation says it was "inaudible," so Dial's version of this interaction is taken from his deposition.

Q (Counsel for the Board): Just tell the court what occurred out in the hall.

A: She was talking to some of her friends.  Me and my girlfriend [Amanda McDaniel] at the time were walking by and she came over behind me and spun me and started hitting me in the face.

...

Q: What occurred then?

A: After she hit me.  I don't know how many times, I can't remember.  And then I hit her and then I went to the office.  Because I know that's where I was going to wound up anyway.

On cross-examination, Dial clarified his recollection of the confrontation:

Q: People right around could see and hear that there was a commotion going on, couldn't they?

A: Yes, sir.

Q: Surely if she spun you around and there was words and she was trying to hit you or hitting you several times, if I'm standing right there, [inaudible] shouldn't you?

A: Oh, no, sir.  Whenever she started hitting me, I . . . she never said anything.  She just came up behind me and never said anything.

Dial then said that he could not actually recall what happened because he lost consciousness:

Q: Okay.  Didn't you tell me in your deposition that really you don't remember exactly how it happened or if she hit or how many times she hit you because you blacked out?

A: Yes, sir, I did.  My mind went black and I couldn't see anything.

Q: So when you testified today that she spun you around and she hit you several times, you can't say that from your own recollection, can you?

A: No, sir.

Q: Because you blacked out and you don't remember?

A: Yes, sir.

After he hit Kala, Dial said, he was not sure of her condition because he "didn't bother looking at her."  He could not remember whether he got knocked down or whether he was standing over Kala as she was on the floor.  Dial conceded that he had no bruises from Kala's blows; he asserted that his face was "red" after the altercation, but then conceded that he did not know whether it was red because he did not look in the mirror.

Westview High student Amanda McDaniel ("McDaniel") also testified about her recollection of the October 2, 2002 events.  At the time, McDaniel and Dial were dating:

Q: Can you explain what you witnessed [in the lunchroom]?

A: He went over there to talk to her and next thing I know I'm hearing her striking him on the chest.  I wasn't really paying that much attention.
Q: Did you go over there and drag him away from the table?
A: No, sir.  Because it had nothing to do with me.

* * *

Q: Well did anything else happen after that lunchroom incident?
A: Yes, sir.
Q: Can you tell the Court what occurred?
A:  We were walking down the hall going to fourth period and she grabbed him by the backpack and started spinning and stuff and like she pushed him a lot and then he finally punched her.

On cross-examination, McDaniel maintained that Kala had instigated the physical confrontation:

Q: Okay.  And you're saying she just attacked Mr. Dial without him doing anything or saying anything and hit him several times?
A: He didn't say nothing to her that [inaudible]
Q: But you're saying she hit him several times?
A: Yes, sir.
Q: How did she hit him?
A: Punching him.

Prior to Kala punching Dial, McDaniel said, she and Dial were in the hallway "side by side holding hands."  When Kala began hitting Dial, McDaniel "just backed up because [she] wasn't in the middle of it and [she] didn't want [Kala] swinging and hitting [her]."

The trial court heard lengthy testimony from Coach Taylor.  Coach Taylor testified that, with the exception of a year in the armed services, he had been the assistant principal at Westview High since 1994, with primary responsibility for student discipline.  Emphasizing the number of students at the school, Coach Taylor said that he had not become aware of Dial's disciplinary problems until he heard Kala's complaints.  He explained that many of the entries in Dial's disciplinary record were for discipline imposed by teachers, so he, Coach Taylor, had no knowledge about those entries.  He had no independent recollection of meeting with Dial's mother.  Coach Taylor explained that, even though Dial's middle school, alternative school, and Westview High are all part of the Weakley County school district, the school records from the middle school and the alternative school were not sent to Westview High when Dial enrolled there as a student.  Consequently, Coach Taylor was not aware of Dial's disciplinary record at the lower schools.  Coach Taylor said that he is normally informed if a student has been sent to the alternative school, but he was not aware that Dial had attended it.  He did not make any inquiries about Dial's background.

Coach Taylor recalled Kala coming to see him about Dial engaging in "name calling," but said that she did not seem to be in fear of Dial.  He emphasized that Dial asserted that Kala was "aggravating" him as well.  Coach Taylor described his position as "sitting here in the middle" and

said that he "treated both sides the same." He admitted that Dial's conduct violated rules in the school's policy and procedures manual, but added that "[w]e've had a lot worse." Coach Taylor did not think that Dial's conduct at that time warranted a suspension or a conference with Dial's parent. Had he known of Dial's disciplinary record, Coach Taylor said, he would probably have had "a little longer conversation" with Dial about his conduct. Changing the students' schedules to minimize contact was not practical. Coach Taylor conceded that he had heard "from somebody" that Dial had told Kala and her brother Matthew, "you all get on down the hall before I'll whip y'all's ass," but said that he was not made aware of the confrontation in the lunchroom shortly before Dial hit Kala.

Coach Taylor acknowledged talking to Matthew about meeting Dial outside of school to "take care of the problem," but recalled that the conversation took place after Kala was injured, and that he told Matthew, "[I]f you all are going to handle it, get it off the school grounds."

Both of Kala's parents testified about the day of the incident and about Kala's injury and recovery. Kala's father, Plaintiff/Appellee Lexie Dean ("Mr. Dean"), testified that, on the day of the incident, he had planned to speak with Coach Taylor about Dial's continued comments to his daughter. The altercation occurred before he had the chance to do so. Both parents testified that Kala experienced emotional problems after the October 2 incident. Before the incident, they said, Kala was a typical fourteen-year-old girl with a lot of friends, excited about being in high school. They testified that Kala changed after the incident. Kala's mother recalled that Kala would not go out in public by herself and had trouble sleeping. Kala attended counseling sessions regularly for approximately six months.[7] Despite the counseling, Kala never felt comfortable returning to public school, and finished her high school education through home schooling.

At the conclusion of the trial testimony, the trial court issued an oral ruling. The trial court reviewed the witnesses' testimony, indicating which testimony was credible and significant to the trial court's decision. The trial judge credited the testimony of Kala's high school friend Nicole Lewis that, on October 2, she was with Kala in the hallway and did not hear or see anything out of the ordinary until Dial hit Kala and she fell to the floor. As to Dial, the trial court commented, "The only part of Mr. Dial's testimony that I believed was when you asked him what his name was." The testimony of Dial's high school girlfriend, Amanda McDaniel, was discredited as well. The trial court stated that the "evidence is overwhelming that Mr. Dial was the instigator of all this."

The trial court found that Kala spoke with Coach Taylor several times about Dial's conduct, each time receiving reassurances that he would "take care" of the situation. It noted that Coach Taylor was told by Kala and her brother Matthew that Dial had made threatening remarks. The trial court found that Coach Taylor's comment to Matthew that Matthew should "do what a brother would do and lock-up outside the school" took place prior to the October 2 incident, not afterward. The trial judge observed that Dial's mother acknowledged that she had had problems with her son, that

_____

[7]The parents also testified that, during her recovery, Kala received harassment that they attributed to Dial or his friends. They received numerous anonymous telephone calls at all hours, either threatening or ridiculing Kala, and people knocking on Kala's bedroom window in the middle of the night.

he had had disciplinary problems involving conduct toward girls in middle school, and that he had been sent to the alternative school. It noted in particular that when Dial was suspended by Westview High during his first year in the ninth grade, Dial's mother asked Coach Taylor to call her if there were any more problems, and Coach Taylor did not do so.

The trial court found that, although Dial's conduct admittedly "violated several codes of behavior in several respects," Coach Taylor did not take any of the actions available to him in the school policy manual. He did not keep records of his conversation with Kala and Dial, he did not talk to other students to try to determine who was at fault, and he did not call Dial's mother. The trial court noted that Coach Taylor did not know Dial's background, did not know that he had been in alternative school, and conceded that he might have done things differently had he known. It stated, however, that if he had "just looked at the records for the preceding year at Westview High, he would have done something about this, but he didn't do it."

The trial court found Dial's disciplinary record to be "of extreme significance." It noted that these records belonged to the Defendant Weakley County Board of Education, which failed to provide the disciplinary records of one school to another school. The trial judge reviewed Dial's disciplinary record, observed that the great majority of Dial's infractions involved female students, and found that it "should have been a red flag to the Weakley [County] Board of Education that he had a problem with women. He bullied them. And if they just looked at the records, they would have known that."

The trial court observed that the school officials' responsibility to provide a safe environment did not mean that the schools were "insurers of the safety of the students." Nevertheless, it found that Dial's assault of Kala was foreseeable by the Weakley County Board of Education, and that the Board was negligent in failing to take appropriate action to protect Kala's safety.

The trial court awarded $75,000 in damages to Kala for emotional distress and pain and suffering, $10,200 to Mr. Dean for Kala's medical bills, and $1,000 to Mr. Dean for loss of consortium. Because it found that Dial was the instigator, the trial court did not reduce the damages award on grounds of comparative fault.

After trial, the Board filed a motion to alter or amend the trial court's judgment or, in the alternative, for a new trial. The Board argued that the trial court erred by (1) awarding Mr. Dean damages for loss of consortium, (2) not dismissing Mr. Dean's claim as time barred, (3) not dismissing Kala's claim under the public duty doctrine, (4) not recognizing Kala's judicial admission that she started the fight and, therefore, shared some of the fault for her injuries, (5) applying the wrong standard for assessing whether the Board established comparative fault, (6) allowing the testimony of Andrew Laney, (7) admitting evidence of Dial's disciplinary records from another school, and (8) awarding damages for emotional distress. The trial court granted the Board's motion as to the award of damages to Mr. Dean for loss of consortium, finding that such damages were not sufficiently pled in the complaint. The motion was denied as to the remainder of the issues. The Board now appeals the judgment.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, the Board raises the following issues: (1) whether the trial court erred in denying its motion for summary judgment prior to trial, (2) whether the Board should have been permitted to assert the public duty doctrine, (3) whether the claim asserted by Mr. Dean was barred by the statute of limitations, (4) whether the trial court erred in permitting the testimony of Andrew Laney, (5) whether the trial court erred by failing to appropriately weigh Kala's admission of fault in the complaint, and (6) whether the trial court applied the wrong standard in assessing comparative fault.

As the trial court was sitting without a jury, we review the trial court's findings of fact *de novo* on the record, with a presumption of correctness. Tenn. R. App. P. 13(d). The trial court's conclusions of law are reviewed *de novo*, with no presumption of correctness. ***Campbell v. Fla. Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996).

## ANALYSIS

### Denial of Summary Judgment Motion

The Board first argues that the trial court erred in denying its motion for summary judgment. In the order denying the Board's motion, the trial court stated, "there exists certain and genuine issues concerning material facts such that summary judgment is not appropriate." When the denial of summary judgment is grounded in the existence of genuine issues of material fact, it is not reviewable on appeal after a trial on the merits. ***Hobson v. First State Bank***, 777 S.W.2d 24, 32 (Tenn. Ct. App. 1989); ***Mullins Precision Rubber Products Corp.***, 671 S.W.2d 496, 498 (Tenn. Ct. App. 1984); ***Tate v. Monroe County***, 578 S.W.2d 642, 644 (Tenn. Ct. App. 1978). Therefore, the trial court's denial of the Board's motion for summary judgment is not reviewable by this Court.

### Public Duty Doctrine

Second, the Board argues that it should have been held immune from liability under the common law public duty doctrine. The public duty doctrine, recognized in ***Ezell v. Cockrell***, 902 S.W.2d 394 (Tenn. 1995), "shields a public employee from suits for injuries that are caused by the public employee's breach of a duty owed to the public at large." ***Ezell***, 902 S.W.2d at 397. Under this doctrine, "private citizens, as such, cannot maintain an action complaining of the wrongful acts of public officials unless such private citizens aver special interest or a special injury not common to the public generally."[8] ***Id.*** (quoting ***Bennett v. Stutts***, 521 S.W.2d 575, 576 (Tenn. 1975)). The public duty doctrine is an affirmative defense to be asserted once it has been determined that the defendant is not immune from liability under the GTLA. ***Id.*** at 400; ***Brown v. Hamilton County***, 126 S.W.3d 43, 48 (Tenn. Ct. App. 2003).

---

[8]The ***Ezell*** court also concluded that the GTLA did not abolish the public duty doctrine. ***Ezell***, 902 S.W.2d at 401.

*Ezell* recognized a "special duty" exception to the public duty doctrine, noting three situations in which the doctrine would not apply:

> [A] special duty of care exists when 1) officials, by their actions, affirmatively undertake to protect the plaintiff, and the plaintiff relies upon the undertaking; 2) a statute specifically provides for a cause of action against an official or municipality for injuries resulting to a particular class of individuals, of which the plaintiff is a member, from failure to enforce certain laws; or 3) the plaintiff alleges a cause of action involving intent, malice, or reckless misconduct.

*Ezell*, 920 S.W.2d at 402. In addition to citing *Ezell*, in support of its argument, the Board cites *Wells v. Hamblen County*, No. E2004-01968-COA-R3-CV, 2005 WL 2007197 (Tenn. Ct. App. Aug. 22, 2005), and *Matthews v. Pickett County*, 996 S.W.2d 162 (Tenn. 1999). Both cases involve a plaintiff who asserted that police officers were negligent in failing to arrest an individual who caused harm to the plaintiff. The Board's argument is premised on its assertion that Coach Taylor is "a public employee who is alleged to have breached a duty that he owed to the public at large."

This assertion conflicts with the numerous Tennessee cases holding that school systems and their teachers and administrators have a duty to exercise reasonable care in the supervision and protection of their students. *See, e.g., Hawkins County v. Davis*, 391 S.W.2d 658, 660 (Tenn. 1965) (holding a school system to a duty of reasonable and ordinary care when a high school student was injured on the steps of a school bus); *Snider v. Snider*, 855 S.W.2d 588, 590 (Tenn. Ct. App. 1993) ("[S]chools, teachers, and administrators have a duty to exercise ordinary care for the safety of their students."); *Roberts v. Robertson County Bd. of Educ.*, 692 S.W.2d 863, 870 (Tenn. Ct. App 1985) (finding that a high school vocational teacher had a duty to exercise reasonable care to protect his students from the risk of injury in shop class). This can include a duty to protect students from the foreseeable intentional acts of third parties. *See, e.g., Haney v. Bradley County Bd. of Educ.*, 160 S.W.3d 886, 899 (Tenn. Ct. App. 2004) (holding that a school board's duty to exercise reasonable care for the safety of its students included a duty to read a parent's explanation for signing out his or her children from school in situation where parent checked the children out and then murdered them).

In this case, we must conclude that the public duty doctrine is not applicable because Coach Taylor and the Board did not simply have a "duty to the public at large"; rather, they had a duty to the students placed in their charge to exercise reasonable care to supervise and protect them. Thus, we affirm the trial court's refusal to apply the public duty doctrine.

## Relation Back of Amendment to Complaint

The Board next asserts that the trial court erred by not dismissing Mr. Dean's individual claim, arguing that the amendment of the Plaintiff's complaint to add Mr. Dean as an individual plaintiff did not relate back to the original date of the complaint and, therefore, his claim was time barred. In this case, the lawsuit was originally filed by Mr. Dean on behalf of his minor daughter

-12-

Kala, seeking, in part, damages for her medical expenses. During the pendency of the action, Kala married. As Kala was a minor at the time of her marriage, she became an emancipated minor. *Holman v. Holman*, 244 S.W.2d 618, 620 (Tenn. Ct. App. 1951); *see also* Op. Tenn. Att'y Gen. 02-100 (Sept. 16, 2002) (opining that a minor who marries is fully emancipated from parental control). Subsequently, in its motion for summary judgment, the Board asserted that Mr. Dean should be dismissed as a plaintiff, because Kala was married and an emancipated minor. In light of the fact that Mr. Dean was responsible for Kala's medical bills, the trial judge instructed the Plaintiffs to amend the complaint to assert a claim for medical expenses by Mr. Dean. This was not done until the eve of trial.[9] As the issue of whether an amendment relates back to the date of the original filing hinges on a question of law, our review is *de novo* with no presumption of correctness. *Campbell*, 919 S.W.2d at 35.

The relation back of amendments to pleadings is governed by Rule 15.03 of the Tennessee Rules of Civil Procedure, which states:

> Whenever the claim or defense asserted in amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party or the naming of the party by or against whom a claim is asserted relates back if the foregoing provision is satisfied and if, within the period provided by law for commencing an action or within 120 days after the commencement of the action, the party to be brought in by amendment (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Tenn. R. Civ. P. 15.03. Thus, under Rule 15.03, in order for relation back to be permitted for the amendment naming Mr. Dean as an individual plaintiff and asserting his claim for Kala's medical expenses, the claim must "arise out of the conduct, transaction, or occurrence set forth . . . in the original pleading." *See McCracken v. Brentwood United Methodist Church*, 958 S.W.2d 797, 796 (Tenn. Ct. App. 1997). That requirement is clearly satisfied here.

Rule 15.03 contains additional requirements for the relation back of an amendment "changing the party or the naming of the party *by or against whom* a claim is asserted . . . ." First, the "party to be brought in by amendment" must have "received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits." Tenn. R. Civ. P. 15.03; *McCracken*, 958 S.W.2d at 796. Second, the "party to be brought in by amendment" must have known or should have known that, "but for a mistake concerning the identity of the proper party, the

---

[9]The record indicates that the Plaintiffs' motion to amend, and the amended complaint, were served on the Board on the eve of trial, but not filed until approximately two months after trial.

action would have been brought against the party." Tenn. R. Civ. P. 15.03; *McCracken*, 958 S.W.2d at 796.

This points up an apparent dissonance in the language of Rule 15.03. By its terms, Rule 15.03 applies to amendments that change plaintiffs as well as amendments that change defendants; the Rule expressly refers to the party "*by or against whom* a claim is asserted . . . ." Tenn. R. Civ. P. 15.03; *see also* ROBERT BANKS JR. AND JUNE F. ENTMAN, TENNESSEE CIVIL PROCEDURE § 5-7(j), at 5-164. The language in the remainder of Rule 15.03, however, seems uniquely applicable to amendments that change the defendant or the naming of the defendant, rather than the plaintiff. For example, Rule 15.03 refers to the added party having "notice of the institution of the action," "maintain[ing] *a defense* on the merits," and having knowledge that, but for the mistake, "the action would have been brought *against* that party." Tenn. R. Civ. P. 15.03(1), (2) (emphasis added).

Why, then, is one part of Rule 15.03 made expressly applicable to a change in the plaintiff or defendant, while the remainder of the language appears applicable only to a change in the defendant? For guidance, we examine the federal counterpart to Tennessee's Rule 15.03, Rule 15(c) of the Federal Rules of Civil Procedure. Rule 15(c) is similar to Tennessee's Rule 15.03 but does not refer to a change in the party "by" whom a claim is asserted; it refers only to a change in the party "against whom" a claim is asserted. Fed. R. Civ. P. 15(c). The advisory committee's notes to Federal Rule 15 state that "[t]he relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c) since the problem is generally easier." Fed. R. Civ. P.15 advisory committee's notes. Commentators interpreting Rule 15(c) also observe that the problem of changing the plaintiff or the naming of the plaintiff has been treated with less suspicion than the problem of changing the defendant or the naming of the defendant. *See* JACK H. FRIEDENTHAL ET AL., CIVIL PROCEDURE § 5.27, at 329 (4th ed. 1999). Courts are less suspicious of adding or changing plaintiffs because "arguably it is not unfair or inconsistent with the statute of limitations to allow an appropriate plaintiff to be substituted for the person who originally brought the suit." *Id.* Thus, while the language of Federal Rule 15(c) differs from Tennessee's Rule 15.03, its application provides some guidance. In this case, the Board had known since the institution of these proceedings that it was facing a claim for medical expenses arising out of Kala's injuries. Adding Mr. Dean as a plaintiff in order to assert this claim could not have surprised the Board or compromised its ability to defend the lawsuit. We affirm the trial court's decision to permit relation back of the amendment adding Mr. Dean as a plaintiff.

### Testimony of Witness Not Identified In Interrogatory Response

The Board argues further that the trial court erred by allowing Andrew Laney to testify about his recollection of the October 2 altercation. At trial, the Board objected to Laney's entire testimony because the plaintiff did not disclose Laney as a person having knowledge in response to the Board's

interrogatories.[10] Laney's name, however, arose in Coach Taylor's deposition, in which Coach Taylor testified that Laney was in the hallway when the incident occurred and restrained Dial after he hit Kala. On this basis, the trial court overruled the Board's objection and permitted Laney to testify. On appeal, the Board argues that the admission of Laney's testimony prejudiced the Board because the trial court relied on Laney's testimony in apportioning the fault for Kala's injuries.

Rule 26.05 of the Tennessee Rules of Civil Procedure states that a party who has responded to a request for discovery is "under a duty seasonably to supplement" its response "with respect to any question directly addressed to . . . the identity and location of persons having knowledge of discoverable matters," Tenn. R. Civ. P. 26.05(1). In 2006, Rule 37.03 of the Tennessee Rules of Civil Procedure was amended to address the all-too-common situation in which a party fails "seasonably" to supplement its response and then seeks to proffer the testimony of a witness not included in its response.[11] As amended, Rule 37.03 states: "A party who without substantial justification fails to supplement or amend responses to discovery requests as required by Rule 26.05 is not permitted, unless such failure is harmless, to use as evidence at trial . . . any witness or information not so disclosed." Tenn. R. Civ. P. 37.03(1). The Advisory Commission comment to the 2006 amendment of Rule 37.03(1) states: "Rule 37.03(1) expressly provides sanctions for failure to supplement or amend discovery responses. The usual sanction will be exclusion of evidence at trial. Courts already have this power under the common law." Tenn. R. Civ. P. 37.03 advisory commission's comment (citing ***Lyle v. Exxon Corp.***, 746 S.W.2d 694 (Tenn. 1988); ***Ammons v. Bonilla***, 886 S.W.2d 239 (Tenn. Ct. App. 1994)).

Citing ***Lyle v. Exxon Corp.***, 746 S.W.2d 694 (Tenn. 1988), the Plaintiffs/Appellees urge that the trial court may consider a number of factors, including the explanation given for failing to name the witness, the importance of the testimony, and the need for time to prepare for the testimony. Ultimately, they contend, the decision of whether to admit the witness' testimony is within the trial court's discretion. ***See Lyle***, 746 S.W.2d at 699.

It is true, of course, that the admissibility of evidence "is within the discretion of the trial judge and will be overturned only when there is an abuse of discretion." ***Rothstein v. Orange Grove Ctr., Inc.***, 60 S.W.3d 807, 811 (Tenn. 2001) (citation omitted). Even discretionary decisions, however, "must take applicable legal principles into account. If the trial court misconstrues or misapplies the law, its discretion lacks the necessary legal foundation and becomes an abuse of discretion." ***BIF, A Div. of Gen. Signals Controls, Inc. v. Serv. Constr. Co., Inc.***, No. 87-136-II, 1988 WL 72409, *3 (Tenn. Ct. App. July 13, 1988).

---

[10]The Board had sent the Plaintiffs interrogatories, including one requesting the identities and locations of all persons having knowledge of any relevant facts. Andrew Laney was not listed in the response to this interrogatory.

[11]Rule 37.03 was amended on December 29, 2005 to add the sanction found in Rule 37.03(1). The amendment became effective on July 1, 2006. Tenn. R. Civ. P. 37.03 advisory commission's comment. The trial in this case occurred on July 25, 2006.

Rule 37.03(1), as amended, leaves less to the discretion of the trial judge. Its language is mandatory; a party who "without substantial justification" fails to supplement such a discovery request "*is not permitted*" to use the evidence at trial unless its failure "is harmless . . . ." Tenn. R. Civ. P. 37.03(1) (emphasis added). Thus, the evidence must be excluded unless the trial court finds that the party had "substantial justification" for its failure to supplement, or that the failure to supplement was "harmless."[12]

Here, the Board objected to Laney's testimony on the basis that the Plaintiffs failed to supplement the interrogatory response to include him. Once the trial court ascertained that Laney was identified as a person with knowledge in the context of a deposition, it overruled the Board's objection to Laney's testimony, apparently implicitly finding that the failure to supplement the interrogatory response had "substantial justification" or was "harmless." Under these circumstances, we cannot say that the trial court misconstrued or misapplied Rule 37.03(1), and therefore find that the trial court did not abuse its discretion in permitting Laney's testimony.

## Judicial Admissions

On appeal, the Board contends as well that the trial court gave no weight to admissions by the Plaintiffs that Kala instigated the physical confrontation with Dial. Had the trial court done so, the Board argues, then it would have assessed some comparative fault against Kala.[13]

The Board relies on the following allegations in the complaint:

10. The following day, October 2nd, 2002, the Defendant Thomas Dial came to [Kala's] lunch table and told her that his girlfriend was going to "whip her ass." During this exchange, the Defendant Thomas Dial got up into [Kala's] face and [Kala] *pushed him away*, which caused him to become angry. He then stated "you just wait."
11. After lunch, [Kala] approached the Defendant Thomas Dial in the hallway and *knocked the strap to his book bag off of his back*.
12. The Defendant Thomas Dial then turned and punched [Kala] in the face knocking her to the floor and knocking her unconscious.

---

[12] This is different from a finding that the trial court's admission of the testimony into evidence was "harmless error," which can only be determined after the fact, in the context of the record as a whole.

[13] On appeal, the Board also puts forth the argument that the trial court gave insufficient consideration to Kala's actions when analyzing proximate cause. Specifically, it argues that Kala's actions were a "subsequent intervening cause" of her injuries, such that she could not recover from the Board. The trial court did not consider this argument because the Board did not raise that issue at trial or in its motion to alter or amend the judgment. Accordingly, there is no finding or conclusion in the trial court's final order concerning the issue of subsequent intervening cause that this Court can review on appeal. *See* Tenn. R. App. P. 36(a). Therefore, we decline to consider this issue in this appeal.

Complaint (emphasis added). As in many fact-intensive lawsuits, particularly those in which witness perceptions figure heavily, the proof "evolved" somewhat from the time the complaint was filed. At trial, it became apparent that Kala did not recall any physical contact with Dial in the lunchroom on October 2 and remembered virtually nothing about the events in the hallway until she woke up on the floor. When asked if she knocked Dial's book bag off his shoulder in the hallway, Kala testified, "That's what people has told me." None of the witnesses proffered by the Plaintiffs testified that Kala pushed Dial away from her in the lunchroom or knocked his book bag in the hallway.[14]

After reviewing the pleadings and listening to the testimony, the trial court found that "Mr. Dial was the instigator of all this" and that the evidence did not show that Kala "started the fight." This was based in large part on the trial judge's assessment of the witnesses' credibility. The trial court's determinations of witness credibility and evaluations of disputed evidence are given great weight on appeal. *W.F. Holt Co. v. A & E Elec. Co., Inc.*, 665 S.W.2d 722, 733 (Tenn. Ct. App. 1983) (citation omitted). We will not overturn the trial court's determination of a witness's credibility "absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted).

Parties are, of course, bound by the admissions in their pleadings, often considered "judicial admissions."[15] *Pankow v. Mitchell*, 737 S.W.2d 293, 296 (Tenn. Ct. App. 1987) ("[F]actual statements contained in pleadings filed on behalf of a party may be considered as admissions."). In this case, the admissions on which the Board relies do not amount to an admission that Kala "instigated" a fight with Dial. The complaint says only that , when Dial "got up into" Kala's face, she pushed him away, and that she knocked the strap of Dial's book bag off his shoulder in the crowded hallway. Based on the overall testimony and record, we cannot say that the trial court did not give appropriate weight to the admissions in the complaint in determining comparative fault.

## COMPARATIVE FAULT

Finally, the Board argues that the trial court applied the wrong standard in evaluating whether the Board had shown Kala to be comparatively at fault for her injuries. In issuing its oral ruling at the conclusion of the trial, the trial court stated, "I don't find that there's clear and convincing evidence in the record to support the proposition that [Kala] started the fight." In its motion to alter or amend the judgment, the Board argued that this demonstrated that the trial court applied the wrong

---

[14]Dial and his witness, McDaniel, testified that Kala did both.

[15] A judicial admission is a formal statement, either by [a] party or his or her attorney, in course of judicial proceeding which removes an admitted fact from field of controversy . . . . [It] is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's knowledge . . . . Judicial admissions . . . are considered conclusive and binding as to the party making the judicial admission.

29A AmJur 2d, *Evidence*, § 770.

standard when apportioning fault, and that application of the correct standard would have resulted in a finding that Kala was at least partially at fault for her injuries.

At the hearing on the Board's motion to alter or amend the judgment, the trial judge responded to the Board's argument on this issue:

> THE COURT: If [clear and convincing evidence is] what I said, I was in error when doing that. I don't even know what clear and convincing evidence means. I've heard the expression all my life, but I still never have learned what it means. So if I said that, I should have been corrected and said preponderance of the evidence.
> MR. SELLERS: Okay, Your Honor. That is certainly what is in – I think in the way it was stated that you found no clear and convincing evidence of any comparative fault back against the plaintiff, I think is what –
> THE COURT: Well, I may have said something to the effect or intended something to the effect that not only by the preponderance of the evidence, there is no comparative fault even if you applied the standard clear and convincing evidence rule. In any event, I did not – it was not my intent to use a clear and convincing standard of – in this case.
> If I said that, it was in error. And it will not affect the outcome. I reach the same conclusion by applying the preponderance of the evidence.

Thus, the trial court stated that it did not intend to use the "clear and convincing" standard, and would reach the same conclusion using the "preponderance of the evidence" standard.

The record overall supports the trial court's findings. The situation in this case can be compared to that in *Turner v. Jordan*, 957 S.W.2d 815 (Tenn. 1997), in which the Court discussed the allocation of fault in a case in which the defendant is alleged to be negligent by failing to prevent the intentional act of a third party. In *Turner*, the defendant psychiatrist was aware of the dangerous propensities of a mentally ill patient, but did not inform the hospital staff or take other steps to prevent the patient from acting on his violent tendencies. The mentally ill patient attacked a hospital nurse, inflicting serious injuries. The nurse then sued the psychiatrist. A jury allocated 100% of the fault to the psychiatrist and 0% to the mentally ill patient. The Court found that where the psychiatrist knew or should have known that the patient posed an unreasonable risk of harm to third parties such as the nurse, he owed her a duty of reasonable care. *Id.* at 820-21. It also held that the defendant's degree of fault should not be reduced by "the occurrence of the foreseeable risk of harm he had a duty to prevent," stating:

> [W]hile a negligent defendant may, of course, raise a third party's intentional act to refute elements of the plaintiffs' negligence claim such as duty and causation, fairness dictates that it should not be permitted to rely upon the foreseeable harm it had a duty to prevent so as to reduce its liability.

*Id.* at 823.

Here, the trial court appropriately focused on the information that was available to Coach Taylor, the information that the Board should have been made available to Coach Taylor, and the actions that Coach Taylor should have taken in response to the information. The Board could have made Dial's school disciplinary record available to officials at Westview High, but failed to do so. When Kala's complaints about Dial arose, Coach Taylor could have looked into Dial's background before Dial came to Westview High, but Coach Taylor failed to do so. Coach Taylor could have been aware of Dial's record during his first year in the ninth grade at Westview High, but apparently was not. Coach Taylor could have spoken to other students to determine whether Kala was contributing to the ongoing dispute with Dial, or whether Dial had simply decided, for whatever reason, to make her life miserable, but Coach Taylor failed to do so. Had these actions been taken, the trial court concluded, Coach Taylor would have realized that Dial "had a problem with women. He bullied them." Dial's assault, it found, was foreseeable.

The Board emphasizes the Plaintiffs' admissions in the complaint that Kala pushed Dial when he got in her face, and that she knocked his book bag strap off his back. Assuming this is true, it does not affect the degree of fault attributable to the Board. Kala was, at the time, a fourteen-year-old girl. Assuming that the admissions in the complaint are in fact what happened, it is foreseeable that, in the face of relentless harassment and continued inaction by school officials, a fourteen-year-old girl might not respond with perfect restraint. The Board "should not be permitted to rely upon the foreseeable harm it had a duty to prevent so as to reduce its liability." *Turner*, 957 S.W.2d at 823. The preponderance of the evidence in the record supports the trial court's finding that the overall course of events, in particular Dial's assault, was foreseeable, and that the Board had a duty to take preventive actions, but failed to do so.[16]

## CONCLUSION

In conclusion, we do not address the Board's summary judgment argument because the denial of summary judgment was based on existing factual disputes and, therefore, is not reviewable on appeal after a trial on the merits. We affirm the trial court's conclusion that the public duty doctrine is not applicable, its decision to permit relation back of the amendment to the complaint adding Mr. Dean as a plaintiff, and its decision to permit Andrew Laney's testimony. We find that the trial court gave appropriate weight to the Plaintiffs' judicial admissions, and that it evaluated the proof in accordance with the "preponderance of the evidence" standard. Overall, we find that the preponderance of the evidence supports the trial court's finding against the Board.

---

[16]The issue of whether disciplinary actions that could have been taken by Coach Taylor in response to Kala's complaints, such as notifying Dial's mother or an in-school suspension, would have prevented Dial's assault, i.e. proximate cause, was not raised as an issue on appeal.

Accordingly, the judgment of the trial court is affirmed.  Costs on appeal are taxed to the Defendant/Appellant Weakley County Board of Education, and its surety, for which execution may issue, if necessary.


_____HOLLY M. KIRBY, JUDGE