IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2024 Session

## KENNETH KAMMERS ET AL. v. CLARKSVILLE-MONTGOMERY COUNTY SCHOOL SYSTEM ET AL.

**Appeal from the Circuit Court for Montgomery County**
**No. CC-19-CV-750    Adrienne Gilliam Fry, Judge**

_____

### No. M2023-00662-COA-R3-CV

_____

A high school student suffered a serious injury when a classmate, who was not aiming at the injured student, threw a pencil that ricocheted off a surface and hit the student in the eye. The injured student sued the Clarksville-Montgomery County School System, asserting that the classroom teacher was negligent and that the School System was, accordingly, vicariously liable. The circuit court granted the School System's motion for summary judgment, concluding that the student's injuries were not reasonably foreseeable. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Peter M. Olson and S. Nicholas Murphey, Clarksville, Tennessee, for the appellants, Jordynn Kammers, Kenneth Kammers, and Julie Kammers Corlew.

Mark Nolan and Jeff T. Goodson, Clarksville, Tennessee, for the appellee, Clarksville-Montgomery County School System.

## OPINION

### I.

On April 17, 2018, Jordynn Kammers, Nate McCray, and Ethan Hurt were among the students in Ms. Amy Berg's third-period math class at Clarksville High School. That day, Ms. Berg decided to lead each of her classes through a competitive math problem-

solving exercise. Pursuant to her instructions, the students worked in teams collaboratively on a series of math problems. Each problem constituted one "round" for which points were available, and each round took approximately four to five minutes to complete. Once a group of students finalized its answer, the group would send a representative to the front of the classroom to deliver its handwritten answer to Ms. Berg. Groups were given extra points for submitting the first correct answer. Ms. Berg did not instruct or encourage students to throw their handwritten answers or any other objects during class, nor did any students throw anything before the pencil-throwing incident that caused an injury to Ms. Kammers.

The curriculum guide of the State Board of Education identifies specific mathematics principles and standards to be taught, but the curriculum guide does not identify the learning activities that are to be used to teach these principles and standards. The particular learning activity Ms. Berg used that day was, and is, an educational activity that is widely utilized from kindergarten through twelfth grade classrooms in general and at Clarksville High School in particular. Throughout the same academic year, multiple other teachers at Clarksville High School had used the same learning activity. There were no previous incidents at Clarksville High School in connection with using this learning activity. Ms. Berg herself had used the same learning activity during the first two periods that day without incident. She had first become aware of this learning activity at a professional development meeting, which she had attended with her colleagues. Ms. Berg elected to use this learning activity in her classroom because she saw it as an instructional tool that would facilitate student engagement and participation.

On the date of the incident, Ms. Kammers and Mr. McCray were part of one group while Mr. Hurt was a member of another group. Ms. Kammers and Mr. McCray were friends, and there was no history of animosity between Mr. McCray and either Ms. Kammers or Mr. Hurt. For his team, which included Ms. Kammers, Mr. McCray took on the role of delivering answers.

During the first two rounds, other students interfered with Mr. McCray's delivery of his group's answers to Ms. Berg. In the first instance, an unnamed student from Mr. Hurt's group obstructed Mr. McCray's path by sliding a desk in front of him. Ms. Berg responded by giving a class-wide instruction to the students not to slide desks in front of other students. Following her admonition, no further desk sliding occurred for the remainder of class. Then, in the second instance, another unnamed student from Mr. Hurt's group obstructed Mr. McCray's path by extending one arm in Mr. McCray's path. Ms. Berg responded by giving a class-wide instruction to the students to keep their hands to themselves. Approximately thirty minutes passed during which the students followed Ms. Berg's instruction related to keeping their hands to themselves, and Mr. McCray delivered his group's responses without incident during these thirty minutes.

In the last five minutes of class, it is undisputed, however, that Mr. Hurt, in

contravention of Ms. Berg's express instructions, tried to "block or otherwise impede" Mr. McCray's path as he was moving to turn in an answer. Mr. McCray became frustrated and, while standing away from his own group and near Mr. Hurt's group, threw his mechanical pencil in what he called "an emotional release." He characterized his action as a mistake caused by frustration. Mr. McCray was not throwing his pencil at any specific student. Prior to throwing the pencil on this occasion, Mr. McCray had never thrown a pencil before in class. He had no history of emotional outbursts or engaging in any action of this type.

Unfortunately, Mr. McCray's thrown pencil unexpectedly ricocheted off some surface and hit Ms. Kammers's eye, fully penetrating her eyeball. Ms. Kammers underwent multiple reconstructive surgeries to try to remedy her injuries. Ms. Kammers's vision was permanently impaired, and she will be required to seek continual medical treatment to manage her injuries.

In the days following this incident, Ms. Berg sent the following email to the Kammers family:

> I wanted to reach out and let you know how terribly sorry I am that Jordynn's accident happened in my classroom. I failed to see the situation getting out of hand in time to prevent any bad behavior. I have teenagers, I feel like I should have seen it coming.

> I have been getting updates from Mr. Feldman about how Jordynn is doing. All of you and the doctors who are treating her are in my prayers. Hopefully she is getting the best care and has the best outcome possible given the situation.

> . . .

> If there is anything at all I can do for you or anything that you need, please let me know. We miss having Jordynn in class, and I hope she recovers some of her vision and some kind of normal again.

Ms. Kammers and her family sued Mr. McCray, Mr. Hurt, and the Clarksville-Montgomery County School System (School System) in Montgomery County Circuit Court. After reaching settlements with Mr. McCray and Mr. Hurt, Ms. Kammers narrowed her lawsuit to alleging fault against the School System. Ms. Kammers alleged in her complaint that Ms. Berg acted negligently during the third-period math learning exercise and that her negligence allowed the family to proceed against the School System under an exception to Tennessee's Governmental Tort Liability Act (GTLA). Ms. Kammers asserted that Ms. Berg owed her a heightened, professional duty of care by virtue of both Tennessee's education statutes and the School System's internal policies, which were memorialized across several documents, including teacher, student, and administrative

policies and guidelines, as well as Ms. Berg's job description. In Ms. Kammers's view, Ms. Berg breached that heightened duty by not taking additional affirmative steps to prevent her injury, including but not limited to forcing Mr. McCray's group to choose a different member to deliver its answers to the front of the room, "severely" punishing the students in Mr. Hurt's group to deter them from obstructing Mr. McCray, or terminating the learning exercise altogether after the first two instances of what she describes as prohibited bullying and boisterous student misconduct. Relying heavily upon Ms. Berg's email to the Kammers family, Ms. Kammers alleged that her injury would not have occurred but for Ms. Berg's failure to act and that her injury was reasonably foreseeable.

The School System sought summary judgment. In doing so, the School System asserted that Tennessee's education statutes did not convert Ms. Berg into a professional for purposes of tort liability. The School System also asserted that its internal policies could not be used to establish the duty and breach elements of negligence insofar as Ms. Kammers was endeavoring to proceed under a negligence per se theory. The School System also emphasized the unforeseeable nature of this incident based on the information available to it at the time. The School System submitted, and Ms. Kammers agreed, for the purposes of summary judgment: (1) that there was no evidence of any prior hostilities between Ms. Kammers, Mr. McCray, and Mr. Hurt; (2) that, in fact, Ms. Kammers and Mr. McCray were good friends who often interacted in a positive way outside of class; (3) that Mr. Hurt was a relatively new student at Clarksville High School; (4) that there was no documentation of Mr. McCray ever throwing his pencil in class in the past, and, similarly, that there was no evidence of Mr. McCray having a reputation for such behavior; (5) that, even after acknowledging that there is some dispute as to whether the School System officially permitted teachers like Ms. Berg to use the competitive exercise that was implemented during her third-period math class, no other teacher who had used the same type of exercise in his or her classroom had ever reported any incidents arising during the exercise; (6) that in response to the two instances of students interfering with Mr. McCray while he was delivering his group's answers, Ms. Berg had instructed the class to stop; and (7) that Ms. Berg had neither instructed nor encouraged her students to throw objects during the exercise. The confluence of these facts, the School System argued, made it unforeseeable that, after an extended period of compliance with Ms. Berg's instructions, Mr. Hurt would allegedly impede Mr. McCray's path, that Mr. McCray would then throw his mechanical pencil in frustration, that the mechanical pencil would ricochet off another surface, and that the mechanical pencil would then hit Ms. Kammers in the eye.[1]

---

[1] The School System also argued that Ms. Kammers's lawsuit fell outside the bounds of a permissible suit under the GTLA as a result of "discretionary function" exception and that, consequently, the School System retained its statutory immunity. *See Bowers by Bowers v. City of Chattanooga*, 826 S.W.2d 427, 431 (Tenn. 1992). The circuit court did not rule upon the School System's alternative argument. While the School System does not raise this as a separate issue in the statement of issues, the School System suggests in the analysis section of its briefing on appeal that this court could forego reviewing the trial court's merits ruling and instead affirm on the basis that the School System retained its GTLA immunity. As noted above, the circuit court did not rule on this issue. For purposes of this appeal,

The circuit court agreed with the School System. Declining to apply a special heightened standard of care to Ms. Berg's conduct or treat her as a "professional" as that term is understood in negligence cases, the circuit court instead applied the traditional common law standard of care and concluded that Ms. Kammers's claim failed due to unforeseeability. The circuit court explicitly tied its unforeseeability ruling to the duty element, writing that "[w]ithout having met the threshold requirement in the duty analysis," it did not need to go any further to resolve the School System's motion for summary judgment. The circuit court concluded that what happened to Ms. Kammers was "an unfortunate, but unforeseeable accident."

Following the denial of her post-judgment motions, Ms. Kammers appealed the circuit court's grant of summary judgment. On appeal, she states the issues that she is presenting as follows:

> I. Is There Material Evidence in the Record, When Taken in the Light Most Favorable to the Non-moving Party (Plaintiffs), That Establish a Prima Facie Case of GTLA Liability Pursuant to TCA § 29-20-205?
>
> II. Did the Trial Court Make an Error of Law when Applying Rule 56 Standards, and Act as the Trier of Fact, Deciding Controverted Evidence Which Supported the Rule 56 Moving Party, and Excluding Contrary Material Evidence of Two Prior Instances of Misconduct which Support the Non-Moving Parties/Plaintiffs?
>
> III. Is it Reasonably Foreseeable that an Innocent Bystanding Student in a Classroom Might Be Injured, If a Teacher Fails to Administer Swift, Certain and Severe Discipline to Prevent a Continued Course of Student Misconduct Violative of the School's "Zero-Tolerance" Policies Against Violence?

Ultimately, Ms. Kammers's arguments are an assertion that the circuit court erred by granting summary judgment to the School System.

II.

An appellate court's review of "a trial court's summary judgment decision is de novo without a presumption of correctness." *Regions Bank v. Prager*, 625 S.W.3d 842, 849 (Tenn. 2021). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

---

we assume without deciding that Ms. Kammers could pursue damages against the School System here without running afoul of the GTLA.

to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. In making this assessment, a court must view the evidence "in a light most favorable to the claims of the nonmoving party, with all reasonable inferences drawn in favor of those claims." *Cotten v. Wilson*, 576 S.W.3d 626, 637 (Tenn. 2019) (quoting *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 286 (Tenn. 2015)). In conducting this review, a Tennessee appellate court makes "a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250.

III.

At the heart of this appeal is the parties' disagreement over the foreseeability of Ms. Kammers's injuries. Ms. Kammers believes her injuries were reasonably foreseeable and that Ms. Berg had a duty to Ms. Kammers to take affirmative steps to prevent them from occurring. Ms. Kammers asserts that Ms. Berg should have forced Mr. McCray's group to change their designated answer deliverer, instituted "swift, certain, and severe" punishment on Mr. Hurt's group for obstructing Mr. McCray's path, or terminated the classroom exercise altogether. The School System disagrees, arguing that Ms. Kammers's injuries resulted from a regrettable but unforeseeable accident. The School System contends that Tennessee law does not require Ms. Berg to take any affirmative action beyond the steps she took leading up to the accident, i.e., verbally instructing the students not to impede the pathway of others.

This duel over foreseeability takes place in the context of Ms. Kammers's negligence suit. A plaintiff seeking to establish liability for an actor's negligent conduct is required to establish "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008).

The issue of foreseeability lies at the center of the negligence framework. *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008) (relying on *West v. E. Tennessee Pioneer Oil Co.*, 172 S.W.3d 545, 552 (Tenn. 2005), for the principle that "[f]oreseeability is the test of negligence"). Given its critical role, we have previously recognized that the issue of foreseeability can touch on multiple elements of negligence. *Richardson v. Trenton Special Sch. Dist.*, No. W2015-01608-COA-R3-CV, 2016 WL 3595563, at *5 (Tenn. Ct. App. Jun. 27, 2016) (noting that legal commentators have sparked some "debate" over "whether foreseeability in negligence law is a question of duty[,] . . . a question of breach[,] . . . or a question of proximate cause . . . .").

In the present case, the circuit court expressly tied its decision to grant the School System's motion for summary judgment on the issue of foreseeability to the element of duty. Having concluded, under the undisputed facts of this case, that Ms. Kammers's injury was the result of an "unforeseeable accident," the circuit court determined that Ms.

Kammers failed to "me[e]t the threshold requirement in the duty analysis."

Given the basis of the trial court's conclusion and the parties' arguments, we focus our attention on the circuit court's decision concerning lack of foreseeability in the context of duty. *Compare Landry v. Sumner Cnty. Bd. of Educ.*, No. M2019-01696-COA-R3-CV, 2020 WL 3550052, at *2, 5-6 (Tenn. Ct. App. Jun. 30, 2020) (opting to address foreseeability in the context of both duty and proximate cause where the trial court did not specify which element it deemed outcome-determinative when granting a school board's motion for summary judgment), *with Phillips ex rel. Gentry v. Robertson Cnty. Bd. of Educ.*, No. M2012-00401-COA-R3-CV, 2012 WL 3984637, at *3-4 & n.1 (Tenn. Ct. App. Sept. 11, 2012) (acknowledging that foreseeability might impact other elements but constraining review to proximate causation where the trial court ruled on the proximate cause element and the parties' main arguments on appeal focused on that element). Within Tennessee tort law, "[w]hether a defendant owes a plaintiff a duty of care is a question of law." *Trentham v. Mid-Am. Apartments*, *LP*, 705 S.W.3d 151, 161 (Tenn. 2025).

IV.

Ms. Kammers's briefing raises two foundational matters that may shape the ultimate analysis in the present case and that, accordingly, need to be addressed before moving to the heart of the matter and the dispositive foreseeability analysis underlying the trial court's decision to award summary judgment. These foundational matters involve application of professional standards and purported statutory and policy violations.

A.

With regard to professional standards, Ms. Kammers's briefing is somewhat unclear on the nature of her argument. At times Ms. Kammers's briefing seems to suggest a heightened professional standard for teachers that needs to be determined through expert testimony, akin to medical testimony,[2] but she also seems to embrace the traditional reasonable person / ordinary negligence standard that has long been applied to teachers in Tennessee. For example, Ms. Kammers states the following:

> Prior to enactment of Tennessee's education statutes cited herein, Tennessee common law jurisprudence already recognized "the standard of care for school teachers . . . is that of an ordinarily reasonable and prudent person in such a position acting under similar circumstances." *Hawkins County v.*

---

[2] *See, e.g.*, *Cox v. M.A. Primary & Urgent Care Clinic*, 313 S.W.3d 240, 258 (Tenn. 2010) ("[I]n a professional malpractice action, the defendant 'is responsible for any damage which may result to those who employ him from the want of the necessary and proper knowledge, skill, and science which such profession demands.' . . . Thus, '[p]rofessionals are judged according to the standard of care required by their [own] profession.'" (citations omitted)).

*Davis*, 216 Tenn. 262, 267, 391 S.W.2d 658, 660 (1965).[3]  This common law standard of reasonable care for teachers is consistent with general tort jurisprudence and Tennessee's evolving educational statutes.  Basic tort principles concerning reasonable care under the circumstances apply to teachers.  "A teacher's standard of care can be related directly to the nature of the persons to whom the duty is owed and the circumstances giving rise to the duty, requiring the exercise of caution commensurate with the dangers involved."  *Hawkins,* citing *Townsley v. Yellow Cab Co.*, 145 Tenn. 91, 93-94, 237 S.W. 58 (1962) and *International Harvester Co. v. Sartain*, 32 Tenn. App. 425, 454-455, 222 S.W.2d 854, 867 (1948).[4]  The teacher has the duty to take those precautions that any ordinarily reasonable and prudent teacher would take to protect their students from an unreasonable risk of injury.  *See*, *Tennessee Trailways, Inc. v. Ervin*, 222 Tenn. 523, 528, 438 S.W.2d 733, 735 (1969).  So, the statutes codifying the teacher as a professional are not inconsistent with nor do they negate previous common law duties of a teacher.  What is ordinary, reasonable and prudent to protect students for a teacher is not within the knowledge of the average lay person, and must be established by an expert teacher.  *See*, *Bowman v. Henard*, 547 S.W.2d 527 at 531 (Tenn.1977); *Rose v. Welch*, 115 S.W.3d 478 (Tenn. Ct. App. 2003).

Because Ms. Kammers's briefing on this matter suggests both a professional standard of care and the traditional "reasonable person" standard of care, it presents challenges to fully reconciling her various assertions.

To the extent that Ms. Kammers suggests any fundamental change in Tennessee tort law analysis has occurred or that negligence by an educator is now analyzed similarly to medical negligence, we are unpersuaded that such a change occurred surreptitiously. Ordinary negligence has long been understood in Tennessee as "the failure to exercise reasonable and ordinary care under the circumstances." *Burgess v. State*, 369 S.W.2d 731, 733 (Tenn. 1963).  "In Tennessee, school teachers must exercise reasonable and ordinary care under the circumstances  . . . ." *Wherry v. Obion Cnty. Bd. of Educ.*, No. W2024-00693-COA-R3-CV, 2025 WL 1219032, at *5 (Tenn. Ct. App. Apr. 28, 2025). Over the course of decades in tort suits, Tennessee courts have repeatedly indicated that the

---

[3] The language that Ms. Kammers represents as being quoted from *Hawkins County v. Davis* does not actually appear in the Tennessee Supreme Court's opinion in the case.  In fact, we have been unable to locate the quoted language in any Tennessee appellate decision.

[4] Again, the language that Ms. Kammers represents as being quoted from *Hawkins County v. Davis* does not actually appear in the Tennessee Supreme Court's opinion in the case. Additionally, Ms. Kammers represents that *Hawkins County v. Davis* cited *Townsley v. Yellow Cab Co.*, 145 Tenn. 91, 93-94, 237 S.W. 58 (1962) and *International Harvester Co. v. Sartain*, 32 Tenn. App. 425, 454-455, 222 S.W.2d 854, 867 (1948) in support of the quoted proposition. Neither of these opinions, however, are cited in the *Hawkins County v. Davis* decision.

applicable standard for assessing the purported negligence of a teacher is one of ordinary negligence. *See*, *e.g.*, *Hopper v. Obion Cnty. Sch. Sys.*, No. W2021-00805-COA-R9-CV, 2022 WL 2116482, at *3 (Tenn. Ct. App. June 13, 2022) ("'[T]eachers and other school personnel must conform to a standard of reasonable and ordinary care under the circumstances.' . . . Therefore, 'the standard of care for school teachers and administrators is that of a reasonable person in such a position acting under the same or similar circumstances.'" (citations omitted)); *Crockett v. Sumner Cnty. Bd. of Educ.*, No. M2015-02227-COA-R3-CV, 2016 WL 6995483, at *7 (Tenn. Ct. App. Nov. 30, 2016) ("Teachers and other school officials are required to exercise the standard of care that is 'reasonable and ordinary care under the circumstances.'"); *Dean v. Weakley Cnty. Bd. of Educ.*, No. W2007-00159-COA-R3-CV, 2008 WL 948882, at *11 (Tenn. Ct. App. Apr. 9, 2008) (observing that there are "numerous Tennessee cases holding that school systems and their teachers and administrators have a duty to exercise reasonable care in the supervision and protection of their students"); *Rathnow v. Knox Cnty.*, 209 S.W.3d 629, 634 (Tenn. Ct. App. 2006) (indicating that for teachers, "[t]he standard of care is that of reasonable and ordinary care under the circumstances"); *Nickelson v. Sumner Cnty. Bd. of Educ.*, No. 01A01-9807-CV-00375, 1999 WL 767813, at *3 (Tenn. Ct. App. Sept. 29, 1999) ("[T]eachers and other school personnel must conform to a standard of reasonable and ordinary care under the circumstances. . . . The standard of care for school teachers and administrators is that of a reasonable person in such a position acting under the same or similar circumstances."); *Murray v. Bryant*, No. 01A01-9704-CV-00146, 1997 WL 607518, at *7 (Tenn. Ct. App. Oct. 3, 1997) ("It is true that teachers must conform to a 'standard of reasonable and ordinary care' under the circumstances to their students"); *Neal v. Fayette Cnty. Bd. of Educ.*, No. 02A01-9412-CV-00271, 1996 WL 243896, at *3 (Tenn. Ct. App. May 9, 1996) (noting that teachers are "required to exercise such care as ordinarily reasonable and prudent persons would exercise under the same or similar circumstances"); *Cadorette v. Sumner Cnty. Bd. of Educ.*, No. 01A01-9510-CV-00441, 1996 WL 187586, at *2 (Tenn. Ct. App. Apr. 19, 1996) ("Negligence can be established only upon a showing that the teacher's or supervisor's actions amounted to a deviation from what a reasonable and prudent person would do under the same or similar circumstances. . . . Simply stated, there is no liability for the results of an accident that could not have been foreseen by a reasonably prudent person."); *Chadwick v. Clarksville Montgomery Cnty. Unified Sch. Sys.*, No. 01A01-9504-CV-00166, 1995 WL 675876, at *1 (Tenn. Ct. App. Nov. 15, 1995) (noting that "the duty of care imposed upon school teachers is that of reasonable and ordinary care"); *Smith v. Robertson Cnty. Bd. of Educ.*, No. 01A01-9310-CV-00462, 1994 WL 108909, at *4 (Tenn. Ct. App. Mar. 30, 1994) ("[T]he care required of school teachers is that of reasonable and ordinary care under the circumstances."); *Snider v. Snider*, 855 S.W.2d 588, 590 (Tenn. Ct. App.1993) ("[S]chools, their teachers, and administrators have a duty to exercise ordinary care for the safety of the students."); *Ferguson v. Metro. Gov't of Nashville*, No. 01-A-01-9211-CV00434, 1993 WL 115661, at *4 (Tenn. Ct. App. Apr. 16, 1993) ("The care required of school teachers is that of reasonable and ordinary care under the circumstances."); *Dufala v. Knox Cnty. Bd. of Educ.*, No. 03A01-9110CV00377, 1992 WL 75868, at *2 (Tenn. Ct. App. Apr. 16, 1992) (indicating that "teachers, and

through them their local school systems, are required to exercise such care as ordinarily reasonable and prudent persons would exercise under the same or similar circumstances"); *McCann v. Coleman*, No. CA 45, 1990 WL 97860, at *3 (Tenn. Ct. App. July 17, 1990) (noting that for teachers "[t]he standard of care is that of reasonable and ordinary care under the circumstances"); *Craig v. Metro. Gov't of Nashville*, No. 86-370-II, 1987 WL 12497, at *5 (Tenn. Ct. App. June 19, 1987) (stating that "teachers are required to exercise such care as ordinarily a reasonable and prudent person would exercise under the same or similar circumstances"); *King by King v. Kartanson*, 720 S.W.2d 65, 68 (Tenn. Ct. App. 1986) (stating that for teachers, "[t]he standard of care is that of reasonable and ordinary care under the circumstances").

Faced with a mountain of precedent indicating what standard is applicable to negligence claims involving teachers, Ms. Kammers argues a change has occurred. She does so by pointing out that several education statutes in effect at the time she was injured use the terms "professional" and "profession" when referring to educators. *See, e.g.,* Tenn. Code Ann. §§ 49-5-501(3)(D) (defining "[c]onduct unbecoming to a member of the teaching profession" in part as "[d]isregard of the teacher code of ethics in part 10 of this chapter, in such manner as to make one obnoxious as a member of the profession"); -1003(b)(3) (imposing a responsibility upon educators to "[p]rovide students with professional education services in a nondiscriminatory manner and in consonance with accepted best practices known to the educator"); -1003(b)(11) (stating that educators should "[n]ot use the educator's professional relationship with the student for private advantage"); -1003(b)(12) (instructing educators "[n]ot [to] disclose information about the student obtained in the course of the educator's professional service, unless disclosure of the information is permitted, serves a compelling professional purpose, or is required by law"); -1003(b)(19) (requiring educators to "[m]aintain a professional approach with the student at all times").

None of these statutes, however, expressly or impliedly upend Tennessee's longstanding common law standards for assessing teacher negligence. Though Ms. Kammers cites *Rose v. Welch*, 115 S.W.3d 478 (Tenn. Ct. App. 2003), and *Bowman v. Henard*, 547 S.W.2d 527 (Tenn. 1977), in her opening brief to support her proposition that a professional heightened standard of care is applicable in the school context, neither of those cases involved schoolteachers, as *Rose* dealt with attorneys and *Bowman* dealt with physicians. Additionally, Ms. Kammers relied on *Moore v. Houston Cnty. Bd. of Educ.*, 358 S.W.3d 612 (Tenn. Ct. App. 2011) in her reply brief, but *Moore* did not establish a heightened standard of care.[5] *See Moore*, 358 S.W.3d at 619. Ms. Kammers has also failed to cite any legal authority showing that simply using the terms "professional" and

_____

[5] *Moore* is a case focused on the issue of proximate causation, not the duty of care owed to students. But, even in addressing the proximate causation element, *Moore* described the concept of foreseeability using the reasonable person standard. *Moore*, 358 S.W.3d at 619 (relying on *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991), for the rule that a plaintiff must show that "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence").

"profession" in the Tennessee Code in addressing teachers automatically changes the standard of care in negligence cases or implicitly abrogates the common law.

We generally presume that "statutes will not be interpreted as changing the common law unless they effect the change with clarity." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 318 (2012) (explaining that the presumption against change in common law reflects that "[a] fair construction ordinarily disfavors implied change"). The Tennessee Supreme Court recently discussed the contours of abrogation, explaining that

> [a]s a general matter, the intention to abrogate must be clear. In recognition of this principle, courts do not broadly construe statutes that are in derogation of the common law. . . . The legislature need not affirmatively proscribe a common law principle to abrogate it, but courts should presume that the legislature acted with the expectation that a common law principle applies except when a statute's purpose to the contrary is evident. Stated another way, legislative acts should not be construed to displace the common law any further than they expressly declare or necessarily imply.

*Ultsch v. HTI Mem'l Hosp. Corp.*, 674 S.W.3d 851, 868 (Tenn. 2023) (citations omitted).

The General Assembly has certainly not legislated to expressly displace Tennessee's longstanding tort law standard of ordinary and reasonable care for assessing whether teachers have acted negligently. Ms. Kammers has implicitly assumed that the use of the words "professional" and "profession" in the education statutes satisfies the test delineated in *Ultsch* but has not developed an argument or presented compelling support that would drive us to embrace her sweeping conclusion. Given the limits of the argument, as it has been presented, we are unconvinced that these statutes can bear the weight Ms. Kammers places on them for transforming Tennessee's approach to assessing teacher liability from one of ordinary to one of professional negligence. We decline to find an implied abrogation of common law standards for assessing teacher negligence. Here, the circuit court's decision not to apply professional negligence standards such as those used in medical or legal claims to Ms. Berg, a teacher, is consistent with longstanding Tennessee tort law and appropriate given the deficiencies in Ms. Kammers's argument on this point.

B.

We turn next to Ms. Kammers's second foundational contention — that Ms. Berg's negligence is demonstrated via her purported violation of certain internal policies and provisions of the education statutes. Ms. Kammers insists these policies and statutes imposed a duty on Ms. Berg to impose "swift, certain, and severe" punishment on Mr. Hurt's group so as to proactively prevent Ms. Kammers's injury. This part of Ms. Kammers's argument harkens back to the theory of negligence per se that she pleaded in

- 11 -

her complaint. As with her professional standards arguments, there are certainly challenges in fully apprehending Ms. Kammers's contentions on these points.

Ultimately, for several reasons, Ms. Kammers's argument is unavailing. One, the School System's internal policies are neither statutes nor ordinances. *See Haney v. Bradley Cnty. Bd. of Educ.*, 160 S.W.3d 886, 892-93 (Tenn. Ct. App. 2004). In the context of negligence per se cases filed against schools, this court has distinguished between violations of "a statute or ordinance," which typically build the basis of negligence per se, and "[the] violation of one's own rules," which sometimes "may require more, or they may require less, than the law requires." *Snider*, 855 S.W.2d at 590-91 (citing *Epstein Henning & Co. v. Nashville Chatt. & St. L. Ry. Co.*, 4 Tenn. App. 412 (1926)). Accordingly, this court has repeatedly held that the "violation of a school system's internal policies and procedures does not constitute negligence per se." *Rowland v. Metro. Gov't of Nashville*, No. M2012-00776-COA-R3-CV, 2013 WL 784582, at *14 (Tenn. Ct. App. Feb. 28, 2013) (collecting cases). Insofar as Ms. Kammers has taken a position to the contrary, it is foreclosed by our precedent.

Setting the School System's internal policies to the side, Ms. Kammers has also pointed this court to several sections of the education statutes that were in effect at the time of her injury that, in her view, imposed an affirmative duty upon Ms. Berg to take "swift, certain, and severe" action in response to the actions of Mr. Hurt and his group members. *See* Tenn. Code Ann. §§ 49-5-4216 (requiring school systems to have a policy imposing "swift, certain and severe disciplinary sanctions on any student" engaged in bullying) (effective Mar. 24, 2016, to May 1, 2019), *repealed by* 2019 Pub. Acts, c. 248, § 68; -4503 (outlining obligations of school systems with respect to bullying policies).

However, these statutes only place an obligation on schools to adopt certain policies related to bullying. *See* Tenn. Code Ann. §§ 49-5-4216 ("Each local and county board of education shall file annually . . . written policies and procedures developed and adopted by the board" concerning topics like bullying); -4503 ("Each school district shall adopt a policy prohibiting harassment, bullying or cyber-bullying.").

Assuming for the sake of this discussion that Ms. Kammers's characterization of these incidents as bullying is accurate, neither of these statutes identifies a specific action that a teacher must take in response to bullying, nor do they purport to place an affirmative duty upon a teacher to do so. These statutes only purport to instruct school districts to create anti-bullying policies.

This matters because we have previously said that "the negligence *per se* doctrine 'is not a magic transformational formula that automatically creates a private negligence cause of action for the violation of every statute. To trigger the doctrine, the statute must establish a specific standard of conduct." *Shaw v. Metro. Gov't of Nashville & Davidson Cnty.*, 596 S.W.3d 726, 734 (Tenn. Ct. App. 2019) (quoting *Rains v. Bend of the River*, 124

S.W.3d 580, 590 (Tenn. Ct. App. 2003)). In other words, a statute is insufficient in the context of a negligence per se theory if "it contains only 'general guidance' and is 'posed in non-specific terms.'" *Id.* at 735.

Yet the statutes Ms. Kammers relies upon here do exactly that: they simply instruct school districts to create policies with respect to prohibited actions like bullying without identifying particular sanctions or responses schoolteachers should implement upon observing a prohibited act. The use of the phrase "swift, certain and severe" in the now-repealed Tennessee Code Annotated section 49-5-4216 appears to be nothing more than "general guidance . . . posed in non-specific terms" to school districts in how to fashion what sanctions might be appropriate to impose upon students for misconduct rather than the creation and imposition of an affirmative duty upon teachers to undertake a "specific standard of conduct." *See id.* Accordingly, we respectfully disagree with Ms. Kammers's argument that the circuit court erred in not viewing these statutes as having established a statutory duty to act under a negligence per se theory.

V.

We now return to the heart of Ms. Kammers's appeal — her assertion that the circuit court erred in concluding that her injury was unforeseeable. This court has observed that

> Society places a significant responsibility upon school officials to provide a safe environment for our children, the students. However, such a responsibility does not make our school officials insurers of the safety of [their] students. To the contrary, teachers and school districts are not expected to be insurers of the safety of students. . . . Moreover, Tennessee does not impose upon teachers the duty to anticipate or foresee the hundreds of unexpected student acts that occur in our public schools. This is particularly true when injury results from conduct that constitutes a radical departure from reasonable conduct.

*Mason ex rel. Mason v. Metro. Gov't of Nashville & Davidson Cnty.*, 189 S.W.3d 217, 221 (Tenn. Ct. App. 2005). Alternatively, "we have no hesitation in holding a teacher or local school system to the duty of safeguarding students from reasonably foreseeable dangerous conditions." *Id.* at 224. "A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable." *Downs ex rel. Downs*, 263 S.W.3d at 820 (quoting *West*, 172 S.W.3d at 551). In assessing foreseeability, "the foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred." *Moore,* 358 S.W.3d at 619.

- 13 -

In surveying Tennessee cases regarding injuries in schools, precedents have repeatedly highlighted certain facts and circumstances that are significant in making an assessment as to foreseeability. While certainly not an exhaustive list, this court has previously emphasized: (1) the history of the school at issue, including whether similar incidents have happened in the past;[6] (2) the history of the students at issue, including their relationships with each other;[7] (3) the nature of the injury, including whether an object or

[6] *See, e.g., Hopper*, 2022 WL 2116482, at *5; *Landry*, 2020 WL 3550052, at *6 ("It is undisputed that there were no reported injuries related to chairs that had been placed upside down on the lunchroom tables falling prior to Noah's injury; this fact militates against a finding that an incident like the one that resulted in Noah's injury was reasonably foreseeable or probable."); *Richardson*, 2016 WL 3595563, at *5 ("Here, however, it is undisputed that, prior to the assault on C.N.R., a first or second grader sexually assaulted another first or second grader in a bathroom at the same school."); *Phillips ex rel. Gentry*, 2012 WL 3984637, at *6 ("In the present case . . . the school was aware of prior incidents of bullying or teasing involving Jacob . . . ."); *Santiago v. Cooper*, No. W2003-01882-COA-R3-CV, 2004 WL 1159644, at *5 (Tenn. Ct. App. May 18, 2004) ("Additionally, it is undisputed that an accident of this nature . . . has never occurred at Dresden Elementary School."); *Murray*, 1997 WL 607518, at *7 ("The evidence clearly reveals that the use of dangerous weapons had not reached a life or health threatening level at the J.T. Moore School."); *Kindred*, 946 S.W.2d at 49 ("[I]ncidents involving students grabbing, pushing, and threatening other students occurred quite often at the school. Coach Anderson testified that he constantly heard students make threats similar to the threat made . . . in this case, but, in the coach's experience, this was the first time a student actually had carried out such a threat."); *Cadorette*, 1996 WL 187586, at *4 ("Ms. Yeary taught art classes for 25 years . . . [and] estimated that nine-hundred to one thousand high school students . . . [had] modeled on tables in her classrooms. Ms. Yeary testified that she had never known a subject to faint as Cadorette did."); *Chudasama*, 914 S.W.2d at 925 (emphasizing that "the locker room had previously been the site of only two fights in nine years"); *Roberts v. Robertson Cnty. Bd. of Educ.*, 692 S.W.2d at 872 (noting that the schoolteacher "had a practice of permitting inexperienced freshman students to remain in the shop area unsupervised in the presence of fully operational power driven equipment which, if used improperly, could cause serious injury"); *Brackman v. Adrian*, 472 S.W.2d 735, 738 (1971) (noting that softball had been played "at school many times").

[7] *See, e.g., Phillips ex rel. Gentry*, 2012 WL 3984637, at *6 ("[T]here was some evidence that W.K. was one of the bullying students identified to the school. Moreover, . . . Jacob had special needs that were known to the school."); *Moore*, 358 S.W.3d at 620 (emphasizing that the child who attacked the plaintiff "had previously exhibited aggressive tendencies"); *Mason*, 189 S.W.3d at 226 (emphasizing that "neither student had a disciplinary record indicative of violent behavior" and that "the girls did not know each other prior to the day of the assault"); *Kindred*, 946 S.W.2d at 50 ("Coach Anderson had never known Oliver to have a weapon or to cause any problems around the school. Principal Hawkins corroborated Coach Anderson's testimony, stating that, based on his knowledge of Oliver as a former student, the principal would not have expected Oliver to carry out his threat."); *Chudasama*, 914 S.W.2d at 925 ("There was also no record of problems between Jennifer and the girls who actually attacked her . . . ."); *McCann*, 1990 WL 97860, at *3 ("The record shows that at the time of the accident Richard was a normal, healthy, 15-year-old young man. He did farm work. He had played softball, baseball, and some football. He had run this same type of relay race before without incident. He had no handicaps which would make this type of activity inappropriate for him."); *King by King*, 720 S.W.2d at 68 (pointing out that the plaintiff "was a well-coordinated youngster, thirteen years old, alert and not absent-minded, had no hearing or vision problems, and was a dependable young man, mature for his age. He knew to look both ways before crossing a street. There is nothing in the record to suggest that he required any special help in crossing the street or

involved instrumentality is inherently dangerous;[8] (4) the circumstances of the injury, including whether it occurred within the context of a dangerous activity;[9] and (5), the actions of supervising teachers or school employees leading up to the injury, including whether those employees were on notice that an incident was brewing and whether they took actions that might have made the resulting injury less likely to occur.[10]  *See, e.g.,*

---

that his normal propensities made him reckless or disdainful of danger."); *Roberts*, 692 S.W.2d at 872 ("Mr. Ballard gave Yount a drill bit knowing that he had never used the drill bit before . . . ."); *Brackman*, 472 S.W.2d at 738 (noting the student's experience playing softball "many times," that she was "athletically inclined" and "skilled" at the game).

[8] *See, e.g., Hopper*, 2022 WL 2116482, at *5; *Mason*, 189 S.W.3d at 225 (noting that a straight razor used to injure another student can have a dual purpose of being a classroom aid for a cosmetology class or a dangerous instrumentality when used for violent purposes); *Santiago*, 2004 WL 1159644, at *5 ("We note that the object that caused the injury [wa]s not a dangerous instrumentality. . . .  Here, the cause of injury is a plastic toy hammer, which is an age-appropriate toy specifically designed for young children at play."); *Nickelson*, 1999 WL 767813, at *4 ("[A] metal meter stick, while obviously capable of inflicting injury as it did here, is not, in and of itself, a dangerous instrumentality and is used routinely in classrooms."); *Cadorette*, 1996 WL 187586, at *4 ("[W]e note that the injury in this suit did not involve a dangerous instrumentality . . . ."); *Roberts*, 692 S.W.2d at 872 ("Mr. Ballard knew that this drill bit could be dangerous if used improperly.").

[9] *See, e.g., Sharp v. Anderson Cnty.*, No. 03A01-9508-CV-00282, 1996 WL 42237, at *2 (Tenn. Ct. App. Feb. 5, 1996) (concerning horseplay during lunch break); *Cadorette*, 1996 WL 187586, at *4 (emphasizing in a case involving art class student who "stood on a table" that "[t]here is no evidence that the table was unsteady"); *McCann*, 1990 WL 97860, at *1 (running down a concrete sidewalk); *Roberts*, 692 S.W.2d at 872 (concerning shop class filled with power tools); *Brackman*, 472 S.W.2d at 735 (playground softball game).

[10] *See, e.g., Hopper*, 2022 WL 2116482, at *1; *Moore*, 358 S.W.3d at 619 ("HCMS administrators were on notice that Tyler intended to harm Trevor.  The evidence shows that Trevor and his father complained to HCMS administrators throughout the 2006-07 school year regarding the bullying and harassing behavior Tyler exhibited toward Trevor."); *Mason*, 189 S.W.3d at 226 ("The cosmetology teacher had no knowledge of antagonism between the two girls . . . ."); *Haney*, 160 S.W.3d at 899 (determining that a genuine dispute of material fact arose about foreseeability when an ex-spouse's stated reasons to school officials for checking the children out of school before murdering the children included "Pay Back" and "Keeping Promise by Mother"); *Nickelson*, 1999 WL 767813, at *4 (emphasizing that the teacher "was not even aware the students were tugging on the ruler"); *Murray*, 1997 WL 607518, at *7 ("There is no evidence that the supervisors should have foreseen that Herbst would bring a pistol to school . . . ."); *Sharp*, 1996 WL 42237, at *2 (pointing out a disagreement between the parties about whether a school teacher instructed students to stop engaging in horseplay or, instead, encouraged the horseplay); *Chudasama*, 914 S.W.2d at 925 ("But there is no evidence in the record that Mr. Summral was aware of the antagonism between Jennifer and Starr, or that he knew a fight between the two girls was widely anticipated by his students."); *Snider*, 855 S.W.2d at 591 (explaining that the circumstances behind the parent signing out the child gave school officials "no notice that the person signing the child out posed a threat" and that "although Kelly's parents were aware" of the danger "there is no proof in the record that the school officials were aware of that evidence"); *Roberts*, 692 S.W.2d at 872 ("Providing the drill bit to Yount, knowing at the time that the shop equipment was fully operable, that other students were working in the shop area without supervision, and that Yount was eager to use the drill bit constitutes a breach of Mr. Ballard's duty to supervise his students properly . . . .").

*Mason ex rel. Mason*, 189 S.W.3d at 223-227 (addressing each of these inquiries based on principles derived from *Roberts v. Robertson County Board of Education*, 692 S.W.2d 863 (Tenn. Ct. App. 1985), *Chudasama v. Metro. Government of Nashville and Davidson County*, 914 S.W.2d 922 (Tenn. Ct. App. 1995), and *Kindred v. Board of Education of Memphis City Schools*, 946 S.W.2d 47 (Tenn. Ct. App. 1996)).

In Ms. Kammers's case, these considerations do not support Ms. Kammers's position that her injuries were of the kind that Ms. Berg could have reasonably anticipated happening as a byproduct of Mr. McCray's interactions with Mr. Hurt and his group. The parties agree that there is no documentation in the record of a similar incident occurring at Clarksville High School, and there is no history of any injuries resulting from the widely implemented math exercise that Ms. Berg used to foster learning in her classroom. *See Santiago*, 2004 WL 1159644, at *5 (emphasizing that the relevant accident "ha[d] never occurred at Dresden Elementary School" before); *Cadorette*, 1996 WL 187586, at *4 (observing that not one out of nearly one thousand students had fainted while modeling in a particular teacher's art class in her twenty-five years of teaching). There is similarly no evidence in this record of any prior animosity between Mr. McCray, Mr. Hurt and his group members, or Ms. Kammers. *See Mason*, 189 S.W.3d at 227 (noting the absence of disciplinary records for the involved students and acknowledging that "the girls did not know each other prior to the day of the assault"); *Chudasama*, 914 S.W.2d at 925 ("There was also no record of problems between Jennifer and the girls who actually attacked her . . . ."). By all indications, Ms. Kammers and Mr. McCray were good friends, which makes it less foreseeable that Mr. McCray would be involved in an incident that would lead to Ms. Kammers suffering life-altering injuries. Additionally, Ms. Kammers was not injured by an inherently dangerous instrumentality but by a pencil, which a high school student can be expected to wield without teacher supervision. We agree with this court's reasoning in *Hopper v. Obion County School System* that "a mechanical pencil is 'obviously capable of inflicting injury,' but 'is not, in and of itself, a dangerous instrumentality and is used routinely in classrooms.'" *Hopper*, 2022 WL 2116482, at *5 (quoting *Nickelson*, 1999 WL 767813, at *4); *cf. Santiago*, 2004 WL 1159644, at *5 (recognizing that "a plastic toy hammer, which is an age-appropriate toy specifically designed for young children at play" could not be considered a dangerous instrumentality under the circumstances even though it caused injury to another student during indoor recess).

Ms. Kammers primarily leans upon cases connected with dangerous activities in schools and those cases examining whether the schoolteacher had actual notice of the danger. Starting with the former, Ms. Kammers argues that the particular version of the math exercise that Ms. Berg chose to implement in her class was somewhat dangerous due to the infusion of competitiveness into the classroom environment, which could have been the motivating factor for the students in Mr. Hurt's group to physically obstruct Mr. McCray's path in his quest to deliver the first correct answer and receive extra points. Of course, this court has not held that competitive activity is per se dangerous activity in the context of school negligence cases. *See, e.g., Brackman*, 472 S.W.2d at 735 (examining

schoolteacher negligence in the context of a playground softball game). Unlike a case like *Roberts*, for example, where students were required to work with heavy-duty power tools and alleged insufficient instructions and supervision from the schoolteacher, the facts of this math exercise do not weigh in favor of viewing it as a dangerous activity. *See Roberts*, 692 S.W.2d at 872. Furthermore, unlike the teacher in *Roberts*, Ms. Berg was present during the math exercise and gave instructions and warnings to the students who had been sliding their desks or putting their arms in front of Mr. McCray, which, it appears, led to extended student compliance. Ms. Berg also never suggested or encouraged the students to throw any objects during the exercise, and Ms. Kammers, since she was not the group's deliverer of answers, was sitting in her chair at the time of her injury and not engaged in any physical activity. There had been no prior injuries reported regarding this exercise as well, which had previously been frequently used in other classrooms at the school. We agree with the School System's characterization of this activity as not inherently dangerous.

Moving to the issue of actual notice, Ms. Kammers relies heavily on Ms. Berg's email to her family as proof that her injuries were objectively foreseeable. However, the key issue is foreseeability *ex ante*, not evidence after the fact that the school or its employees regret not anticipating a certain incident. *See, e.g., Moore*, 358 S.W.3d at 619 (focusing on the fact that the school received complaints for over a year before the incident "regarding the bullying and harassing behavior Tyler exhibited toward Trevor"); *Haney*, 160 S.W.3d at 899 (focusing on an ex-spouse's decision to write down "pay back" as a reason for checking out the children from school and whether the school's employees saw or questioned that reason prior to releasing the children from school); *Nickelson*, 1999 WL 767813, at *4 (focusing on the fact that the teacher "was not even aware the students were tugging on the ruler" prior to the injury at the center of the suit); *Sharp*, 1996 WL 42237, at *2 (focusing in part on the question of whether the teacher instructed students to stop engaging in horseplay or, instead, encouraged the students to continue their horseplay); *Chudasama*, 914 S.W.2d at 925 (emphasizing that, while the students may have anticipated a fight between two girls, there was no evidence in the record that the teacher "knew a fight between the two girls was widely anticipated"); *Snider*, 855 S.W.2d at 592 (focusing on the fact that "there [wa]s no proof in the record that the school officials were aware of" the danger posed by the person checking the children out of the school prior to releasing the children).

Ms. Berg's after-the-fact wish that she had anticipated the event is no more legally conclusive than if she had indicated that there was no way that she could have anticipated it. Her own assessment of what she "should have seen . . . coming" cannot answer the legal question of whether the event was foreseeable such that a legal duty arose. *See Howe v. Haslam*, No. M2013-01790-COA-R3-CV, 2014 WL 5698877, at *25 (Tenn. Ct. App. Nov. 4, 2014) (McBrayer, J., concurring in part) ("[Q]uestions of law are not subject to stipulation by the parties to a lawsuit and . . . a stipulation purporting to state a proposition of law is a nullity." (quoting *Mast Adver. & Pub., Inc. v. Moyers*, 865 S.W.2d 900, 902

(Tenn. 1993)); *Cf. City of Memphis v. Pritchard*, No. W2019-01557-COA-R3-CV, 2020 WL 4354911, at *3 (Tenn. Ct. App. July 29, 2020) ("[A] party's belief as to the interpretation of a statute or ordinance is not binding on this Court, as issues of statutory construction and interpretation are issues of law to be decided by the court alone.")

On this record, we agree with the School System that Ms. Berg did not have sufficient notice to anticipate that Ms. Kammers would be injured in this way. Both parties agree that there were two instances where Mr. Hurt's group interacted in a negative way with Mr. McCray before the throwing of the pencil, that these instances occurred towards the beginning of the class whereas Ms. Kammers was injured at the end of class, and that Ms. Berg's instructions resulted in a prolonged period where Mr. Hurt and his group did not have negative interactions with Mr. McCray. The record suggests that any problems between Mr. McCray and Mr. Hurt's group appeared to have been, but apparently were not, diffused at the beginning of the class. It is less than clear that Ms. Berg could have reasonably anticipated that Mr. Hurt would stop complying and contravene her explicit instruction not to obstruct Mr. McCray's pathway to the front of the room. Even if she could have anticipated such action, she certainly could not have foreseen that Mr. McCray, who had never engaged in such action nor poor conduct more generally, would respond by throwing a pencil toward no one in particular that would then ricochet off a surface and bounce into the eye of a student who was a friend of Mr. McCray. Again, schools and teachers are not insurers of student safety[11] and have no "duty to anticipate or foresee the hundreds of unexpected student acts that occur daily in our public schools"[12] but instead only those that are dangers that are reasonably foreseeable.[13]

Ms. Kammers has suffered a horrible and deeply unfortunate injury. That a student may have engaged in tortious action in causing that injury does not make the school or teacher liable. The circumstances of this case present a freakish and unfortunate accident that simply could not have been foreseen by Ms. Berg. Therefore, we find no fault in the circuit court reaching such a conclusion in the present case.

VI.

For the aforementioned reasons, we affirm the judgment of the Circuit Court for Montgomery County. Costs of this appeal are taxed to the appellants, Jordynn Kammers, Kenneth Kammers, and Julie Kammers Corlew, for which execution may issue if

---

[11] *Marla H.*, 361 S.W.3d at 533 n.16; *Rathnow*, 209 S.W.3d at 634; *Mason*, 189 S.W.3d at 221; *King by King*, 720 S.W.2d at 68; Roberts, 692 S.W.2d at 870.

[12] *Moore*, 358 S.W.3d at 619; *Marla H.*, 361 S.W.3d at 533 n.16; *Mason*, 189 S.W.3d at 224; *Roberts*, 692 S.W.2d at 872.

[13] *Marla H.*, 361 S.W.3d at 533 n.16; *Rathnow*, 209 S.W.3d at 634; *Mason*, 189 S.W.3d at 224.

necessary.  The case is remanded for further proceedings consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE
